# IN THE SUPREME COURT OF IOWA

No. 59 / 06-0191

Filed June 15, 2007

**IN RE THE MARRIAGE OF LYLE MARTIN HANSEN and DELORES LORENE HANSEN**

**Upon the Petition of**
**LYLE MARTIN HANSEN,**

Appellee,

**And Concerning**
**DELORES LORENE HANSEN,**

Appellant.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Washington County, Dan F. Morrison, Judge.

Former husband seeks further review after court of appeals modified dissolution decree. **DECISION OF THE COURT OF APPEALS AFFIRMED AS MODIFIED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED WITH INSTRUCTIONS.**

Frank J. Nidey of Nidey Peterson Erdahl & Tindal, PLC, Cedar Rapids, for appellee.

Constance Peschang Stannard of Johnston & Nathanson, P.L.C., Iowa City, for appellant.

**APPEL, Justice.**

In this case, we review physical care and property issues related to the parties' dissolution of marriage. The district court granted joint legal custody and joint physical care of the two children to Lyle and Delores Hansen. The district court also distributed the property in the marital estate, ordered Lyle to pay alimony, and established child and medical support. Delores appealed. We transferred the case to the court of appeals. The court of appeals reversed the district court on the physical care issue, granting physical care of the children to Delores. The court of appeals decreased the amount Delores was required to pay Lyle as a result of the property distribution and increased the monthly amount and duration of Lyle's alimony payments. The court of appeals further made corrections related to the amount of child and medical support, and awarded Delores $1,000 in attorneys' fees. Lyle sought further review.

With respect to the holdings of the court of appeals, we affirm the holding as modified in this opinion on the physical care issue, order Delores to pay Lyle $22,263 as a result of the property distribution, affirm the increase in alimony, affirm the recalculation of child support and medical benefits, and affirm the award of appellate attorneys' fees. The matter is remanded to the district court for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND.

Lyle and Delores were married on September 4, 1987. The marriage lasted approximately eighteen years. At the time of trial, Lyle was forty-five years of age and Delores was forty-six. Two children were born of the marriage, Miranda, who was twelve years old at the time of the district court proceedings, and Ethan, who was eight.

At all times prior to the filing of the divorce petition, Delores was the primary caregiver. Lyle, alternatively, was the main breadwinner. For example, during the course of the marriage Delores attended parent teacher conferences on a regular basis, while Lyle did not. The vast majority of the time, it was Delores who helped the children with their homework. Lyle admits that she was better at it, particularly math. During the marriage, Lyle missed important childhood events because of social activities or work-related assignments. When the children were in infancy, Delores opened a day care center in their home. Later, when family finances became an issue, she held full-time employment outside the home. After the parties' separation, however, Lyle has become more involved in the lives of the children.

The record developed at trial reveals serious marital stress. The record demonstrates a history of recurrent arguments, excessive consumption of alcohol, allegations of infidelity and sexual misconduct, and allegations of domestic abuse. Unfortunately, at least some of these contretemps were in front of the children. It was not a pleasant proceeding. As part of our de novo review, we have reviewed thoroughly all of these matters, which need not be described in detail here.

The record further reveals that Delores tended to acquiesce to Lyle when there were disagreements. For example, when Delores was pregnant with Miranda, she wanted to attend child-birthing classes, but Lyle stated that *he* had already undergone training and that, as a result, the classes were not needed. When Delores began operating a child care center out of their home, Lyle insisted on reviewing applicant backgrounds and controlled which children could utilize the service. He further demanded that parents or custodians pick up their children by 5:00 p.m. sharp. Delores did not

agree with these practices, but felt she had no choice but to acquiesce. In addition, Delores asked Lyle if he would participate in marital counseling, but he refused, stating that he did not believe in counseling. Delores testified that she agreed to temporary joint physical care prior to trial only because she did not feel she could stand up to her husband. Delores expressed concern that if she disagrees with Lyle, he becomes angry and intimidating.

The parties appear to have different approaches to child rearing. Delores wants the children to be active in the Methodist church and other extracurricular activities. While not being overtly resistant, during the course of the marriage, Lyle did not encourage these kinds of activities. The parties also have different approaches to discipline. Lyle claims to have been the disciplinarian in the marital home. The record reveals that there are occasions when Lyle believed that discipline needed to be more severe than Delores was willing to impose. Lyle acknowledged that, at times, he is overprotective. As Lyle admitted, there are some things that he might let the children do that Delores might not, and vice versa.

At trial, Lyle expressed concern that Delores will expose their children to her family, which he finds highly dysfunctional. Delores testified that her father abused her as a child, but they have reconciled sufficiently to maintain an ongoing relationship. Lyle's concern, however, extends beyond the father, as other members of Delores' family have been convicted of child endangerment and drug offenses. Delores counters that when the children visit her family, it is always under her supervision.

Prior to trial, the parties were apparently able to work out the scheduling issues inherent in a joint physical care arrangement. There was not always agreement, however, on matters related to the children. For

instance, when one child experienced unexpected academic difficulties, Delores believed professional counseling would be of help. Lyle disagreed, once again stating that he did not believe in professional counseling. Delores acquiesced, and counseling was not obtained. On another occasion, the kids called their mother and asked to be picked up because Lyle was angry that they had not cleaned their rooms, and had slammed the kitchen door, breaking its glass pane. Moreover, Delores testified that Miranda told her she desired a more stable living arrangement with a home base.

While much of the record in this case is unattractive, it is clear that both Lyle and Delores love their children. They are both capable of making substantial contributions to their lives. The record further reveals that the children are bright and generally well-adjusted.

With respect to financial matters, the record shows that at the time of trial, Lyle was earning $46,300 per year as a detective for the City of Washington Police Department. Delores was employed as a bank teller, earning $18,900 per year. Delores has only a high school education and little prospect in Washington, Iowa, for substantial increase in income.

The main asset accumulated by the parties was the marital residence. An appraisal obtained in 2001 stated that the value of the property was $112,000. Delores testified that a real estate agent had appraised the value of the residence at $130,000 in 2003 when the parties were seeking to refinance their mortgage. No documentary evidence of the appraisal was introduced at trial.

During the course of the marriage, the parties accumulated considerable debt, at one time rising to as much as $26,000 on numerous credit cards. There is no suggestion that the funds were improperly spent,

but only that Delores and Lyle were, for a period of time, living well beyond their means. Delores testified that she would get cash advances on credit cards so that she could supply her husband with cash when he requested it. She especially did this during times of marital stress hoping to smooth out the relationship. Lyle, however, came to the conclusion that the level of debt was unacceptable, and developed a plan to reduce it. The parties sold their boat and hot tub, and Lyle took an additional job at Hy-Vee. Delores closed the day care, and sought outside employment. As a result of these and other efforts, the debt load was substantially reduced by the time of trial.

The parties also borrowed money from their respective relatives prior to the dissolution of marriage. Delores and Lyle borrowed money from Delores' parents during their marriage, and Lyle borrowed money from his sister, Leigh Wolf, after the separation. At the time of trial, the loans remained unpaid in the amount of $6,500 and $7,391 respectively.

## II. PRIOR PROCEEDINGS.

On November 15, 2004, Lyle filed a petition for dissolution of marriage. The district court entered an order on December 30, 2004 which granted temporary physical care and legal custody to both parents. The temporary order did not establish a physical care schedule. Lyle suggested a pattern of alternating care on a weekly basis, to which Delores acquiesced. The matter came to trial on November 2, 2005. Each party requested physical care. Only Lyle sought joint physical care as a secondary alternative. The district court did not require the parties to submit a joint physical care plan, and, as a result, none was provided to the court. The district court heard testimony from each party and several

additional witnesses. On December 30, 2005, the district court entered findings of fact, conclusions of law, and a decree in the case.

The district court granted "joint legal custody" and "joint physical care" of the minor children to Lyle and Delores. The district court order, however, established a schedule where "physical care" would alternate between Lyle and Delores for six-month periods beginning on January 1, 2006, with liberal visitation for the spouse not currently having physical care.

The district court order nevertheless, recognized the parties' difficulty in making mutual decisions. For example, the court ordered that each parent "shall permit the child(ren) to continue the activities after a physical care change." Because Delores was awarded physical care for the first six-month period, the effect of the court order was that her choices of extracurricular activities would be binding on Lyle. The district court additionally ordered that Delores "shall select the church affiliation for the children." The district court ordered that Delores be present when the children visited her family. The court further ordered that if a party moved from the Washington School District, the nonmoving party shall become the physical custodian until further order of the court.

Lastly, the district court decision contained the following language in bold print:

> **This custody arrangement is predicated on the court's belief that the parties are able to communicate regarding the best interests of their children. Failure to communicate in a positive manner may constitute a basis for modification of this decree.**

With respect to the disposition of the marital property, the district court presented its division of the assets and liabilities of the parties as follows:

|  | **LYLE** |  | **DELORES** |  |
|---|---|---|---|---|
|  | **ASSETS** |  |  |  |
| NWML | $17,189 | Residence | $130,000 |  |
|  |  | Durango | $13,700 |  |
| Tools and Guns | net 0 | Appliances | net 0 |  |
| Bank Accounts | net 0 | Bank Accounts | net 0 |  |
| Personal Property | net 0 | Personal Property | net 0 |  |
| ½ IPERS | net 0 | ½ IPERS | net 0 |  |
| ½ NWML Contract | net 0 | ½ NWML Contract | net 0 |  |
|  |  | NWML | $4,854 |  |
| TOTAL ASSETS | $17,189 |  | $148,554 |  |
|  | **LIABILITIES** |  |  |  |
|  |  | Mortgage | $72,000 |  |
| J.W. McGrath | $541 |  |  |  |
| Leigh A. Wolf | $7,391 | Parents | $6,500 |  |
|  |  | AT & T Credit Card | $6,100 |  |
|  |  | Capital One Card | $8,600 |  |
|  |  | Discover Card | $1,030 |  |
| TOTAL LIABILITIES | $9,237 |  | $94,230 |  |
| **NET TOTALS** | **$7,952** |  | **$54,324** |  |

In light of the above disparity, the district court directed Delores to pay Lyle one half the difference in net assets, which the district court calculated as $23,186. The district court allowed Delores to make

payments on this amount over the next ten years, with interest running at a rate of five percent per annum.

While Delores was required to pay Lyle the above sum, the district court awarded her alimony in the amount of $300 per month for three years. The alimony payments of the district court totaled $10,800.

On appeal, Delores raises four issues.

First, she claims that the district court erred in awarding her and Lyle physical care on an alternating six-month basis. She claims that she should have been awarded physical care. Delores does not challenge, however, the award of joint legal custody.

Second, she challenges the district court's order that she pay Lyle an equalization payment of $23,156 after the distribution of the marital property. With respect to this financial issue, Delores claims that the marital residence should have been valued at $112,000 instead of $130,000, as found by the district court. Delores further claims she was treated unfairly in the distribution of the parties' assets. She generally claims that the debt load assigned to her is excessive and that the resulting debt service is beyond her means. Specifically, Delores asserts that the trial court made a scrivener's error in its calculations by transposing the numbers for total liabilities and net total in Lyle's column. She further asserts that the debt to Lyle's sister should not be allowed in light of the absence of a legal obligation.

Third, Delores claims that the alimony awarded by the district court of $300 per month over a period of three years is too low under these facts and circumstances. Instead, she seeks an award of alimony of $600 per month until she reaches retirement at age sixty-five.

Fourth, she claims that there were errors in the calculation of child and medical support. She claims the district court, in calculating child support, used an incorrect figure for Lyle's income. She further claims that the district court's award of medical support was too low and contrary to Iowa law.

The court of appeals agreed with Delores that the best interests of the children required that she should be awarded physical care. The court of appeals held that the alternating six-month schedule did not promote the legislature's goal of frequent contact with both parents. Further, the court of appeals specifically found that Delores was the primary caretaker and that the children had thrived under her parenting and were comfortable with her care. Although not expressed in these terms, the court of appeals relied upon past history of caregiving and the desire for stability and continuity in awarding physical care to Delores.

With respect to financial issues, the court of appeals held that the marital residence should have been valued at $112,000. In addition, the court of appeals modified the amount of the equalization payment ordered by the district court to correct the scrivener's error. The court of appeals made no further changes in the property distribution. As a result, the court of appeals held that Delores was required to pay Lyle an equalization amount of $13,543, instead of $23,156, over a ten-year period at five percent interest.

The court of appeals also found that the alimony established by the district court was insufficient to do equity. It increased the amount of alimony to $500 per month and extended the period of alimony payments from three years to ten years.

With respect to child support and medical issues, the court of appeals held that the calculation of child support was flawed as a result of the miscalculation of Lyle's income. Further, the court of appeals held that the amount of medical support provided by Lyle was to be increased to reflect the seventy percent/thirty percent difference in their respective incomes.

Finally, with respect to attorneys' fees, the court of appeals granted Delores $1,000 in appellate attorneys' fees.

### III. STANDARD OF REVIEW.

The standard of review is de novo. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). We give weight to the findings of the district court, especially to the extent credibility determinations are involved. *Id.*

### IV. ANALYSIS.

#### A. Custody and Care Issues.

##### 1. Legal Framework.

On appeal, no party contests the district court's award of joint legal custody. With respect to the children, Delores seeks to overturn the district court's ruling awarding joint physical care to both parties. She seeks physical care. Lyle, however, seeks physical care, but in the event this does not occur, is willing to accept joint physical care in the alternative.

At the outset, it is important to discuss the differences between joint legal custody and joint physical care. *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007). "Legal custody" carries with it certain rights and responsibilities, including but not limited to "decisionmaking affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(3), (5) (2005). When joint legal custody is awarded, "neither parent has legal custodial rights superior to those of the other parent." *Id.* § 598.1(3). A parent who is awarded legal

custody has the ability to participate in fundamental decisions about the child's life.

On the other hand, "physical care" involves "the right and responsibility to maintain a home for the minor child and provide for routine care of the child." *Id.* § 598.1(7). If joint physical care is awarded, "both parents have rights to and responsibilities toward the child including, but not limited to, shared parenting time with the child, maintaining homes for the child, [and] providing routine care for the child . . ." *Id.* § 598.1(4). The parent awarded physical care maintains the primary residence and has the right to determine the myriad of details associated with routine living, including such things as what clothes the children wear, when they go to bed, with whom they associate or date, etc.

If joint physical care is not warranted, the court must choose a primary caretaker who is solely responsible for decisions concerning the child's routine care. *Id.* § 598.1(7). Visitation rights are ordinarily afforded a parent who is not the primary caretaker. *Hynick,* 727 N.W.2d at 579.

> ### 2. Traditional Approach of Iowa Appellate Courts to Joint Physical Care.

For decades, Iowa appellate courts have disfavored joint physical care arrangements in dissolution cases as not in the best interest of children. In *In re Marriage of Burham,* 283 N.W.2d 269 (Iowa 1979), this court outlined reasons against "divided custody." Specifically, the court cited Iowa precedent for the proposition that divided custody is destructive of discipline, induces a feeling of not belonging to either parent, and in some instances can permit one parent to sow seeds of discontent concerning the other. *Id.* at 272. Although *Burham* referred to "divided custody," later cases made it clear that the underlying rationale regarding the best interest of children applied to cases involving "joint physical care." *In re Marriage of*

*Roberts*, 545 N.W.2d 340, 342 (Iowa Ct. App. 1996); *In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994); *In re Marriage of Coulter*, 502 N.W.2d 168, 171 (Iowa Ct. App. 1993).

These cases have generally emphasized that the best interest of children is promoted by stability and continuity. Although a child's best interests will be served by associating with both parents, "an attempt to provide equal physical care may be harmfully disruptive in depriving a child of a necessary sense of stability." *In re Marriage of Muell*, 408 N.W.2d 774, 776 (Iowa Ct. App. 1987). As a result, Iowa appellate courts have stated divided physical care is "strongly disfavored" as not in the best interest of children except in the most unusual of circumstances. *Roberts*, 545 N.W.2d at 342*; Brainard*, 523 N.W.2d at 615; *Coulter*, 502 N.W.2d at 170-71.

3. *Legislative Action Regarding Joint Physical Care.*

The Iowa legislature has shown recent interest in joint physical care as a potential alternative in dissolution cases. In 1997 and again in 2004, the legislature amended the Iowa Code to mandate certain procedures regarding the request, award, and denial of joint physical care.

In 1997, the legislature for the first time defined "joint physical care." The legislature further stated that a district court "may consider" joint physical care upon the application of either party. 1997 Iowa Acts ch. 175, § 199 (previously codified at Iowa Code § 598.1(4) (2005)). The 1997 legislation, however, did not contain any substantive standards for determining when joint physical care might be appropriate, but only stated that district courts "may consider" the alternative. As a result, the amendment was a restatement of existing law.

In 2004, the legislature again revisited the issue of joint physical care by amending Iowa Code section 598.41(5) to read, in relevant part:

14

> If joint legal custody is awarded to both parents, the court may award joint physical care to both joint custodial parents upon the request of either parent. . . . If the court denies the request for joint physical care, the determination shall be accompanied by specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child.

2004 Iowa Acts ch. 1169, § 1 (now codified at Iowa Code § 598.41(5) (2005)).

Like the 1997 amendment, the 2004 amendment did not contain a new standard to be employed by the courts in considering whether to award joint physical care. It simply provides that a party interested in joint physical care should request it from the court, and if the court denies joint physical care, it should make findings of fact and conclusions of law that such an alternative was not in the "best interest of the child," which is the traditional standard in child custody matters.

This court has not had occasion to consider the implication of the 1997 and 2004 amendments. In *In re Marriage of Ellis*, 705 N.W.2d 96 (Iowa Ct. App. 2005), however, the court of appeals considered the impact of the amendments on Iowa law. In that case, the court of appeals rejected the claim that the new statutory provisions created a *presumption* in favor of joint physical care. *Id.* at 101-02. On the other hand, the court of appeals came to the conclusion that the amendments had the effect of reversing the traditional disfavor against joint physical care by Iowa courts. *Id.* at 101. According to the court of appeals, while joint physical care is no longer disfavored, it is still not a "preferred" custodial arrangement. *Id.* at 101-02.

We agree with the court of appeals that the 1997 and 2004 legislation did not create a presumption in favor of joint physical care. There is simply nothing in the language of the amendments that supports such an assertion. Indeed, the Iowa legislative action in 1997 and 2004 is strikingly

different from action in other states where presumptions in favor of joint physical care were enacted into law.

Further, it is clear that the Iowa legislature knows how to enact substantive standards in family law matters. With respect to joint custody, the legislature has declared that if the court does not grant joint custody, it shall "cite clear and convincing evidence" that joint custody is unreasonable and not in the best interests of a child. Iowa Code § 598.41(2)(*b*). No similar language appears in the joint physical care provisions of Iowa law.

We disagree, however, with the court of appeals as to whether the 1997 and 2004 amendments have affected any change in substantive law. While the amendments clearly require that courts consider joint physical care at the request of any party and that it make specific findings when joint physical care is rejected, the legislation reiterates the traditional standard—the best interest of the child—which appellate courts in the past have found rarely served by joint physical care. The amendments only require the courts to consider and explain the basis of decisions to deny physical care. *Scott v. Scott*, 579 S.E.2d 620, 623-24 (S.C. 2003) (legislation authorizing consideration of divided custody, when court finds it in best interest of the child, does not overrule prior case law disfavoring arrangement).

4. *Review of the Traditional Approach to Joint Physical Care.*

While we find that the Iowa legislature has not overridden prior case law regarding joint physical care, we nonetheless believe that the notion that joint physical care is strongly disfavored except in exceptional circumstances is subject to reexamination in light of changing social conditions and ongoing legal and research developments. Increasingly in Iowa and across the nation, our family structures have become more

diverse. While some families function along traditional lines with a primary breadwinner and primary caregiver, other families employ a more undifferentiated role for spouses or even reverse "traditional" roles. A one-size-fits-all approach in which joint physical care is universally disfavored is thus subject to serious question given current social realities.

In addition, the social science research related to child custody issues is now richer and more varied than it was in the past. In the past, many scholars and courts rejected joint physical care based on the influential writings of Joseph Goldstein, Anna Freud, and Albert J. Solnit. These scholars utilized attachment theory to emphasize the need to place children with a single "psychological parent" with whom the children had bonded. Joseph Goldstein, Anna Freud, & Albert J. Solnit, *Beyond the Best Interests of the Child* 98 (1979). Although the research upon which the "psychological parent" attachment theory was based rested upon studies of infants, it was also thought to apply throughout the life cycle of a child. Shelley A. Riggs, *Is the Approximation Rule in the Child's Best Interests?*, 43 Fam. Ct. Rev. 481, 484 (2005).

The psychological parent approach stressed the important role of a strong, caring parent-child dyad and embraced what is sometimes termed a monotropic view of infant-child bonding. Robert F. Kelley and Shawn L. Ward, *Social Science Research and the American Law Institute's Approximation Rule*, 40 Fam. Ct. Rev. 350, 355-59 (2002); Peggy Cooper Davis, *The Good Mother: A New Look at Psychological Parent Theory*, 22 N.Y.U. Rev. L. & Soc. Change 347, 360 (1996). The "psychological parent" approach based on attachment theory seems to have influenced a number of courts. *Pikula v. Pikula,* 374 N.W.2d 705, 711 (Minn. 1985), *superseded by statute,* Minn. Stat. § 248.2 (1989), *as stated in Maxfield v. Maxfield,* 452

N.W.2d 219 (Minn. 1990); *In re Custody of D.G.,* 246 N.W.2d 892, 895-96 (N.D. 1976).

Attachment theory that emphasizes primary relationships continues to have strong advocates. Riggs, 43 Fam. Ct. Rev. at 482-90; James G. Dwyer, *A Taxonomy of Children's Existing Rights in State Decision Making About Their Relationship,* 11 Wm. & Mary Bill Rts. J. 845, 913 (2003); Mary Ann Mason, *The Custody Wars: Why Children are Losing the Legal Battle, and What We Can Do About It* 116 (1999). The validity of the parent-child dyad or monotropic view of attachments, however, has been subject to substantial question. Many scholars now view infants as capable of attaching to multiple caregivers and not simply one "psychological parent." Michael E. Lamb, *Placing Children's Interest First: Developmentally Appropriate Parenting Plans,* 10 Va. J. Soc. Pol'y and L. 98, 109-13 (2002). Further, a growing body of scholarship suggests that the continued presence and involvement of both parents is often beneficial to the lives of children and not necessarily detrimental as believed by many adherents of the "psychological parent" theory. *Id.* at 100 (citing disadvantages of children growing up in fatherless families, including psychological adjustment, behavior and achievement at school, educational attainment, employment trajectories, and income generation); Michael T. Flannery, *Is "Bird Nesting" in the Best Interest of Children?,* 57 S.M.U. L. Rev. 295, 302 (2004) (most commentators agree that, generally, children benefit from continued contact with both parents after a divorce).

As a result, a substantial body of scholarly commentary now challenges the blanket application of the monotropic psychological parent attachment theory to avoid joint physical care. For example, reputable scholars have stated that,

despite literature that suggests moderate correlations between conditions of early rearing and classes of later outcomes—for example, with respect to attachment and parental bonding—experts' ability to make specific predictions, given specific conditions (let alone ambiguous ones!) is weak to negligible.

Thomas M. Horner & Melvin J. Guyer, *Prediction, Prevention, and Clinical Expertise in Child Custody Cases in Which Allegations of Child Sexual Abuse Have Been Made,* 25 Fam. L. Q. 217, 248 (1991). Some academic observers suggest that joint physical care may be a way to encourage continued involvement of both spouses in the lives of the children. Matthew A. Kipp, *Maximizing Custody Options: Abolishing the Presumption against Joint Physical Custody*, 79 N.D. L. Rev. 59 (2003); Stephanie N. Barnes, *Strengthening the Father-Child Relationship through a Joint Custody Presumption*, 35 Willamette L. Rev. 601 (1999). They cite a wide range of studies to suggest that children may be better off with joint physical care than other arrangements.

The current social science research cited by advocates of joint custody or joint physical care, however, is not definitive on many key questions. To begin with, there are substantial questions of definition and methodology. Such criticisms include: samples that only examine parents who voluntarily choose joint custody, the use of small and homogenous groups, the skewing of samples toward middle class parents with higher incomes and education, the lack of control groups, and the lack of distinction between "joint custody" arrangements and traditional sole custody with visitation, and the failure to differentiate the effects of preexisting parental characteristics from the effects of custody type. Jana B. Singer & William L. Reynolds, *A Dissent on Joint Custody,* 47 Md. L. Rev. 497, 507 (1988); *see also* Diane N. Lye, *What the Experts Say: Scholarly Research on Post-Divorce Parenting and Child Wellbeing,* Report to the Washington State Gender and Justice Commission

and Domestic Relations Commission 4-2 (1999) (research fraught with methodological difficulties and severe limitations) [hereinafter Lye, Report]; Daniel A. Krauss & Bruce D. Sales, *Legal Standards, Expertise, and Experts in the Resolution of Contested Child Custody Cases,* 6 Psychol. Pub. Pol'y & L. 843, 850 (2000) (noting myriad of conceptual and methodological problems).

Further, the data is conflicting or ambiguous. As noted by one recent academic observer, the research to date on the benefits of joint physical care is inconclusive and has produced mixed results. Stephen Gilmore, *Contact/Shared Residence and Child Well-Being: Research Evidence and its Implications for Legal Decision Making,* 20 Int'l J. L. & Pol'y & Fam. 344, 352-53 (2006); *see also* Krauss & Sales, 6 Psychol. Pub. Pol'y & L. at 857-58 (recent empirical studies of joint custody have not been able to demonstrate a substantial positive effect on postdivorce child adjustment when joint physical care is compared with other custodial arrangements).

An exhaustive review commissioned by the Washington State Supreme Court Gender and Justice Commission and the Domestic Relations Commission examined the many studies related to child custody issues. The review concluded that the available research did not reveal any particular post-divorce residential schedule to be most beneficial to children. While the review concluded that the research did not demonstrate significant advantages to children of joint physical care, the research also did not show significant disadvantages. Lye, Report at Summary.

While it seems clear that children often benefit from a continuing relationship with both parents after divorce, the research has not established the amount of contact necessary to maintain a "close relationship." Preeminent scholars have noted that "surprisingly, even a

fairly small amount of close contact seemed sufficient to maintain close relationships, at least as these relationships were seen from the adolescents' perspective." Eleanor E. Maccoby, et al., *Postdivorce Roles of Mothers and Fathers in the Lives of Their Children*, 7 J. Fam. Psychol. 24, 24 (1993); *see also* Michael E. Lamb, *Noncustodial Fathers and Their Impact on the Children of Divorce in The Postdivorce Family: Children, Parenting, and Society* 105, 111 (Ross A. Thompson & Paul R. Amato eds., 1999) (causal link between frequency of father-child contact and child's adjustment to parental divorce "much weaker than one might expect"); Valarie King, *Variation in the Consequences of Nonresident Father Involvement for Children's Well-Being*, 56 J. of Marriage & Fam. 963, 970-71 (1994) (benefit to child not related to quantity of visits), *as cited in* American Law Institute, *Principles of the Law of Family Dissolution* § 2.02 cmt. f. (2000) [hereinafter *Principles*]; Gilmore, 20 Int'l J. L. & Pol'y & Fam. at 358 (not contact per se but the nature and quality of contact that are important to children's adjustment).

There is thus growing support for the notion that the quality, and not the quantity, of contacts with the non-custodial parent are the key to the wellbeing of children. Quality interaction with children can, of course, occur within the framework of traditional visitation and does not occur solely in situations involving joint physical care.

At present, the available empirical studies do not provide a firm basis for a dramatic shift that would endorse joint physical care as the norm in child custody cases. Nonetheless, in light of the changing nature of the structure of families and challenges to the sweeping application of psychological parent attachment theory, we believe the joint physical care issue must be examined in each case on the unique facts and not subject to

cursory rejection based on a nearly irrebuttable presumption found in our prior cases. Gilmore, 20 Int'l J. L. & Pol'y & Fam. at 360-61 (the law should eschew the use of presumptions in the process of deciding post-separation parenting regimes); Krauss & Sales, 6 Psychol. Pub. Pol'y & L. at 857 (empirical research does not support presumptions to resolve custody disputes); Lye, Report at 4-1 (circumstances of each family are unique, recognition of unique circumstances central to good post-divorce parenting choices).

Any consideration of joint physical care, however, must still be based on Iowa's traditional and statutorily required child custody standard—the best interest of the child. *See* Iowa Code § 598.41(5)(*a*). Physical care issues are not to be resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*. The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity. *Phillips v. Davis-Spurling*, 541 N.W.2d 846, 847 (Iowa 1995); *In re Marriage of Courtade*, 560 N.W.2d 36, 38 (Iowa Ct. App. 1996).

We recognize that the "best interest" standard is subject to attack on the ground that it is no standard at all, that it has the potential of allowing gender bias to affect child custody determinations, and that its very unpredictability increases family law litigation. *See* Robert H. Mnookin, *Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy*, 39 Law & Contemp. Probs. 226, 256-60 (1975); Carl E. Schneider, *Discretion, Rules and Law: Child Custody and the UMDA's Best-Interest Standard*, 89 Mich L. Rev. 2215, 2220-25 (1991). On the other hand, the advantage of the standard is that it provides the flexibility necessary to consider unique custody issues on a case-by-case basis. Katharine T.

Bartlett, *Child Custody in the 21st Century: How the American Law Institute Proposes to Achieve Predictability and Still Protect the Individual Child's Best Interests*, 35 Willamette L. Rev. 467, 470 (1999). We believe the best approach to determining difficult child custody matters involves a framework with some spine, but the sufficient flexibility to allow consideration of each case's unique facts.

In Iowa, the basic framework for determining the best interest of the child has long been in place. In the context of *custody decisions*, the legislature has established a nonexclusive list of factors to be considered. Iowa Code § 598.41(3) (citing nonexclusive factors including suitability of parents, whether psychological and emotional needs and development of child will suffer from lack of contact with and attention from both parents, quality of parental communication, the previous pattern of caregiving, each parent's support of the other, wishes of the child, agreement of the parents, geographic proximity, and safety). Although Iowa Code section 598.41(3) does not directly apply to *physical care* decisions, we have held that the factors listed here as well as other facts and circumstances are relevant in determining whether joint physical care is in the best interest of the child. *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974).

In considering whether to award joint physical care where there are two suitable parents, stability and continuity of caregiving have traditionally been primary factors. *In re Marriage of Bevers*, 326 N.W.2d 896, 898 (Iowa 1982) (noting who during the marriage provided routine care and questioning desirability of the children's nomadic existence for sake of parents); *In re Marriage of Decker*, 666 N.W.2d 175, 178-80 (Iowa Ct. App. 2003) (past primary caregiving a factor given heavy weight in custody matters); *In re Marriage of Williams*, 589 N.W.2d 759, 762 (Iowa Ct. App.

1998) (great emphasis placed on achieving emotional stability for children); *Roberts*, 545 N.W.2d at 343 (though not controlling, due consideration to historical primary caregiver); *Coulter*, 502 N.W.2d at 171 (stability "cannot be overemphasized"). Stability and continuity factors tend to favor a spouse who, prior to divorce, was primarily responsible for physical care. *See* Iowa Code § 598.41(3)(*d*).

We continue to believe that stability and continuity of caregiving are important factors that must be considered in custody and care decisions. As noted by a leading scholar, "past caretaking patterns likely are a fairly reliable proxy of the intangible qualities such as parental abilities and emotional bonds that are so difficult for courts to ascertain." Bartlett, 35 Willamette L. Rev. at 480. While no post-divorce physical care arrangement will be identical to predissolution experience, preservation of the greatest amount of stability possible is a desirable goal. In contrast, imposing a new physical care arrangement on children that significantly contrasts from their past experience can be unsettling, cause serious emotional harm, and thus not be in the child's best interest.

As a result, the successful caregiving by one spouse in the past is a strong predictor that future care of the children will be of the same quality. *In re Marriage of Walton*, 577 N.W.2d 869, 871 (Iowa Ct. App. 1998). Conversely, however, long-term, successful, joint care is a significant factor in considering the viability of joint physical care after divorce. *Ellis*, 705 N.W.2d at 103.

Stability and continuity concepts have been refined in the recent literature and expressed in terms of an approximation rule, namely, that the caregiving of parents in the post-divorce world should be in rough proportion to that which predated the dissolution. Elizabeth S. Scott,

*Pluralism, Parental Preference, and Child Custody*, 80 Cal. L. Rev. 615, 617 (1992). Recently, the American Law Institute's *Principles of Family Law*, published in 2000, adopted the general rule that custodial responsibility should be allocated "so that the proportion of custodial time the child spends with each parent approximates the proportion of time each parent spent performing caretaking functions for the child prior to the parents' separation . . . ." *Principles* § 2:08, at 178. A reporter of the ALI Project on Family Dissolution that produced *Principles* suggests that the ALI approximation rule is gender neutral, focuses on historical facts rather than subjective judgments, and is, in most cases, likely to provide an environment that is in the best interest of the child. Bartlett, 35 Willamette L. Rev. at 480-82.

We do not, however, adopt the ALI approximation rule in its entirety. Iowa Code section 598.41(3) and our case law requires a multi-factored test where no one criterion is determinative. Any wholesale adoption of the approximation rule would require legislative action. *See* W. Va. Code Ann. § 48-9-206(a) (2007).

Nonetheless, we believe that the approximation principle is a factor to be considered by courts in determining whether to grant joint physical care. By focusing on historic patterns of caregiving, the approximation rule provides a relatively objective factor for the court to consider. The principle of approximation also rejects a "one-size-fits-all" approach and recognizes the diversity of family life. Finally, it tends to ensure that any decision to grant joint physical care is firmly rooted in the past practices of the individual family.

There may be circumstances, of course, that outweigh considerations of stability, continuity, and approximation. For example, if a primary

caregiver has abandoned responsibilities or had not been adequately performing his or her responsibilities because of alcohol or substance abuse, there may be a strong case for changing the physical care relationship. *In re Marriage of Ford,* 563 N.W.2d 629, 633 (Iowa 1997) (absence from home and less personal stability of former primary caregiver); *see also Principles* § 2.08(1)(a)-(h). In addition, the quality of the parent-child relationship is not always determined by hours spent together or solely upon past experience. Gary Crippen, *Stumbling Beyond the Best Interests of the Child: Reexamining Child Custody Standard-Setting in the Wake of Minnesota's Four Year Experiment with Primary Caretaker Preference*, 75 Minn. L. Rev. 427, 489-92 (1990); Schneider, 89 Mich. L. Rev. at 2283-87.

All other things being equal, however, we believe that joint physical care is most likely to be in the best interest of the child where both parents have historically contributed to physical care in roughly the same proportion. *Ellis,* 705 N.W.2d at 103; Singer & Reynolds, 47 Md. L. Rev. at 521-22. Conversely, where one spouse has been the primary caregiver, the likelihood that joint physical care may be disruptive on the emotional development of the children increases. *Coulter,* 502 N.W.2d at 171; *Muell,* 408 N.W.2d at 777.

A second important factor to consider in determining whether joint physical care is in the child's best interest is the ability of spouses to communicate and show mutual respect. *Hynick,* 727 N.W.2d at 580; *Ellis,* 705 N.W.2d at 101; Iowa Code § 598.41(3)(*c*). A lack of trust poses a significant impediment to effective co-parenting. Eleanor E. Maccoby & Robert H. Mnookin, *Dividing the Child: Social Costs and Legal Dilemmas of Custody* 276 (1992) [hereinafter Maccoby & Mnookin]. Evidence of

controlling behavior by a spouse may be an indicator of potential problems. *McGee v. McGee*, 224 A.D.2d 832, 835 (N.Y. App. Div. 1996) (citing domineering attitude); *Kline v. Kline*, 686 S.W.2d 13, 15-16 (Mo. Ct. App. 1984) (citing power struggles and hostility). Evidence of untreated domestic battering should be given considerable weight in determining custody and gives rise to a presumption against joint physical care. Iowa Code § 598.41(2)(*c*); *Hynick*, 727 N.W.2d at 579; *In re Marriage of Daniels*, 568 N.W.2d 51, 55 (Iowa Ct. App. 1997).

Third, the degree of conflict between parents is an important factor in determining whether joint physical care is appropriate. Joint physical care requires substantial and regular interaction between divorced parents on a myriad of issues. Where the parties' marriage is stormy and has a history of charge and countercharge, the likelihood that joint physical care will provide a workable arrangement diminishes. It is, of course, possible that spouses may be able to put aside their past, strong differences in the interest of the children. Reality suggests, however, that this may not be the case. Maccoby & Mnookin at 284 (expressing deep concern in cases where there is substantial parental conflict); The Wingspread Report and Action Plan, *High-Conflict Custody Cases*, 39 Fam. Ct. Rev. 146, 146 (2001) ("[h]igh-conflict custody cases seriously harm the children involved").

In short, a stormy marriage and divorce presents a significant risk factor that must be considered in determining whether joint physical care is in the best interest of the children. The prospect for successful joint physical care is reduced when there is a bitter parental relationship and one party objects to the shared arrangement. *Burkhart v. Burkhart*, 876 S.W.2d 675, 680 (Mo. Ct. App. 1994) (allegations of infidelity and breach of trust); *Braiman v. Braiman*, 378 N.E.2d 1019, 1021 (N.Y. 1978) (court ordered joint

custody involving embattled and embittered parents, accusing one another of vices and wrongs, can only enhance familial chaos). As noted in the Washington state review, there is evidence that high levels of child contact with a nonresidential father are beneficial to children in low conflict families, but harmful to children in high conflict families. Lye, Report at 4-17; *see also* Kelly & Ward, 40 Fam. Ct. Rev. at 364 ("much of the research on shared parenting that finds positive effects finds them in the context of postdivorce parental relationships in which high levels of conflict are absent").

Conflict, of course, is a continuum, but expressions of anger between parents can negatively affect children's emotions and behaviors. Hildy Mauzerall, Patricia Young, & Debra Alsaker-Burke, *Protecting of the Children of High Conflict Divorce: An Analysis of the Idaho Bench/Bar Committee to Protect Children of High Conflict Divorce's Report to the Idaho Supreme Court*, 33 Idaho L. Rev. 291, 305 (1997). Even a low level of conflict can have significant repercussions for children. Robert E. Shepherd, Jr., *Legal Dispute Resolution in Child Custody: Comments on Robert H. Mnookin's "Resolving Child Custody Disputes" Conference Presentation*, 10 Va. J. Soc. Pol'y 89, 91 (2002). Courts must balance the marginal benefits obtained from the institution of a joint physical care regime as compared to other alternatives against the possibility that interparental conflict will be exacerbated by the arrangement, to the detriment of the children. Elizabeth Scott & Andre Derdeyn, *Rethinking Joint Custody*, 45 Ohio St. L. J. 455, 457 (1984).

Because of the perceived detrimental impact of parental conflict on children, some commentators have urged that joint physical care should be encouraged only where both parents voluntarily agree to it. Frank F.

Furstenberg, Jr. & Andrew J. Cherlin, *Divided Families:  What Happens to Children When Parents Part* 75-76 (1991); *see* Or. Rev. Stat. § 107.169(3) (2007) (joint custody only upon agreement of parents); Vt. Stat. Ann. tit 15, § 665(a) (2007) ("When parents cannot agree to divide or share parental rights and responsibilities, the court shall award parental rights and responsibilities primarily or solely to one parent.").  Iowa Code section 598.41(5)(*a*), however, requires the court to consider joint physical care upon the request of either party.  While we, therefore, reject the notion that one spouse has absolute veto power over whether the court grants joint physical custody, *In re Marriage of Bolin*, 336 N.W.2d 441, 446 (Iowa 1983), the lack of mutual acceptance can be an indicator of instability in the relationship that may impair the successful exercise of joint physical care. *See* Iowa Code § 598.41(3)(*g*) (court should consider whether one or both spouses agree or are opposed).

A fourth important factor in determining whether joint physical care is in the best interest of the children, particularly when there is a turbulent past relationship, is the degree to which the parents are in general agreement about their approach to daily matters.  *Burham*, 283 N.W.2d at 275 (*citing Dodd v. Dodd*, 93 Misc.2d 641, 647 (N.Y. Sup. Ct. 1978) for the proposition that even joint legal custody assumes "agreement about child rearing practices"); *Burkhart*, 876 S.W.2d at 680 (where record does not show commonality of ideas about child rearing, joint physical care inappropriate); *Horton v. Horton*, 891 A.2d 885, 892 (R.I. 2006) (lack of agreement on discipline a factor).  It would be unrealistic, of course, to suggest that parents must agree on all issues all of the time, but in order for joint physical care to work, the parents must generally be operating from the same page on a wide variety of routine matters.  The greater the amount

of agreement between the parents on child rearing issues, the lower the likelihood that ongoing bitterness will create a situation in which children are at risk of becoming pawns in continued post-dissolution marital strife.

While the above factors are often significant in determining the appropriateness of joint physical care, we do not mean to suggest that they are the exclusive factors or that these factors will always be determinative. This court has stated, despite application of a multi-factored test, that district courts must consider the total setting presented by each unique case. *In re Weidner*, 338 N.W.2d 351, 356 (Iowa 1983) (each case to be considered upon its peculiar circumstances). The above factors present important considerations, but no iron clad formula or inflexible system of legal presumptions.

Once it is decided that joint physical care is not in the best interest of the children, the court must next choose which caregiver should be awarded physical care. Iowa Code § 598.41(1)(*a*), (5). The parent awarded physical care is required to support the other parent's relationship with the child. *Id.* § 598.41(5)(*b*). In making this decision, the factors of continuity, stability, and approximation are entitled to considerable weight. The court should be alert, however, to situations where the emotional bonds between children and a parent who has not been the primary caregiver are stronger than the bonds with the other parent.

In making decisions regarding joint physical care and, if joint physical care is not appropriate, in choosing a spouse for physical care, courts must avoid gender bias. *In re Marriage of Tresnak*, 297 N.W.2d 109, 112-13 (Iowa 1980). There is no preference for mothers over fathers, or vice versa. The preference is to advance gender neutral goals of stability and continuity

with an eye toward providing the children with the best environment possible for their continued development and growth.

In summary, we believe that statements in the case law indicating that joint physical care is strongly disfavored are overbroad. Factors often of importance in determining the viability of joint physical care include an overriding interest in stability and continuity, the degree of communication and mutual respect, the degree of discord and conflict prior to dissolution, and the extent to which the parties agree on matters involving routine care. While we believe that in many contested cases, the best interests of the child will not be advanced by joint physical care, the courts must examine each case based on the unique facts and circumstances presented to arrive at the best decision.

### 5. *Best Interests of Children in this Case.*

In light of the above principles, and after our de novo review of the entire record, we agree with the court of appeals that joint physical care is not in the best interest of the children under the unique facts presented in this case. For most of the marriage, Delores has been the primary caregiver. The concepts of continuity, stability, and approximation thus cut strongly against joint physical care as a quality alternative least disruptive to the children and most likely to promote their long-term physical and emotional health. *Decker*, 666 N.W.2d at 178; *Walton*, 577 N.W.2d at 870; *Bevers*, 326 N.W.2d at 898.

The record also shows that the parties have significant difficulties in communication. Lyle has strong beliefs, and Delores tends to attempt to avoid conflicts with him by simply acquiescing. Further, the divorce proceedings demonstrated considerable mutual distrust and a high level of conflict between the parties, complete with allegations of sexual

improprieties and domestic abuse. It is noteworthy that while Lyle disputed most of the alleged incidents of physical abuse, he admitted that he and Delores engaged in "pushing matches." Furthermore, there was substantial evidence in the record that Lyle has a controlling personality that could extend into the post-divorce world. In light of this record, there is a distinct danger that flare-ups in the relationship could disrupt the children's lives in a joint physical care context. *Hynick*, 727 N.W.2d at 580.

The record also demonstrates differences in parenting styles. Lyle admits to being "overly protective." Their discipline styles are also different, with Lyle recognizing that there are some things that he would allow, but Delores would not, and vice versa. Additionally, Lyle and Delores have different views on the potential role of counseling in helping the children through the difficulties created by divorce. While the parties were able to handle the logistics of joint physical care pursuant to the district court's temporary order, this factor is not dispositive. Over the long haul, we believe there is a high potential for conflict if joint physical care were to continue.

The district court recognized the problems in the relationship and attempted to address them in its order. For example, the court found it necessary to decide who would determine the children's religious affiliation and to include pointed language ensuring that extracurricular choices of each spouse would be honored. These are the kind of decisions that inhere in joint custody, not joint physical care. *See* Iowa Code § 598.41(5)(*b*). The fact that the district court found it necessary to include such provisions, and thereby raise the possibility of contempt in the event of violation, does not reflect a high degree of confidence in the ability of the parties to have a

smooth, working relationship which is a prerequisite to a successful joint physical care arrangement.

The district court's order alternating physical custody on six-month intervals may have also been designed to lessen potential friction between the parties. There was no evidence in the record to suggest that the alternate six-month arrangement was designed to accommodate work schedules of the parties or was based on some other logistical factor. Like the court of appeals in this case, a number of appellate courts have invalidated similar arrangements. *Ireland v. Ireland*, 914 S.W.2d 426, 429 (Mo. Ct. App. 1996) (invalidating change of custody every two months); *In re Custody of D.M.G.*, 951 P.2d 1377, 1387 (Mont. 1998) (reversing two-year alternating custody order); *Reavis v. Reavis*, 955 P.2d 428, 432-33 (Wyo. 1998) (reversing two-month alternate custody). As noted by the Washington Supreme Court, orders which provide for alternating residence of the child for substantially equal intervals can result when the parties and the courts are searching to avoid underlying disputes. *In re Marriage of Littlefield*, 940 P.2d 1362, 1369 (Wash. 1997), *superseded by statute*, Wash. Rev. Code § 26.09.405-560 (2000); *but see Kaloupek v. Burfening*, 440 N.W.2d 496, 498-99 (N. D. 1989) (affirming trial court order alternating custody on six-month basis); *Drewry v. Drewry*, 622 S.W.2d 206, 209 (Ark. Ct. App. 1981) (same).

It is not necessary, however, for us to consider the validity of such an alternating physical care arrangement. Having examined the entire record, we hold that this is not a case where joint physical care is in the best interest of the children in light of the primary caregiving responsibilities of Delores, the communication and respect issues, the contentiousness of the marriage, and the lack of agreement on daily matters. We conclude that the

best interest of the children will be advanced by awarding physical care to Delores rather than to award joint physical care.[1]

At the same time, Lyle has an important role to play in his children's lives. No one questions his devotion to them and their need for his guidance and support. A responsible, committed, nonresident parent, with good parenting skills, has the potential to engage in a high-quality relationship with his or her child and to positively impact the child's adjustment. Gilmore, 20 Int'l J. L. & Pol'y & Fam. at 352.

Because the district court ordered the parties to share joint legal custody, Lyle will continue to be involved in major decisionmaking for his children. In order to promote the desirable level of physical contact, on remand, the district court should establish liberal visitation for Lyle, which includes visitation every other weekend, commencing at 6:00 p.m. on Friday night and concluding at 6:00 p.m. Sunday evening and every Wednesday night commencing at 6:00 p.m. and ending at 8:00 a.m. Thursday morning. Lyle shall have visitation on his birthday and Father's Day every year. Delores, conversely, shall have physical custody of the children on her birthday and Mother's Day each year. In addition, Lyle shall have visitation on every other holiday including New Year's Day, Easter, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, Christmas Eve, Christmas, New Year's Eve. Holiday visitation shall be from 9:00 a.m. to 9:00 p.m. Lyle shall have visitation on the children's birthdays on odd numbered years, while Delores shall have even numbered years. In addition, Lyle shall have visitation of the children in the summer for a total of four weeks

---

[1]Lyle claims the court of appeals did not make specific findings of fact and conclusions of law as required by Iowa Code section 598.41(5)(*a*). The court of appeals, however, did find that Delores was the primary caregiver, had been a good mother, that the children had thrived in her care, and that the best interest of the children would be served by awarding Delores physical care. We find that the court of appeals adequately explained its reasoning to meet the requirement of section 598.41(5)(*a*).

at two two-week intervals. These two-week intervals shall be separated by at least one week. Lyle shall give Delores written notice no later than April 15 of each year of the times at which he wishes to exercise these vacation periods. During one of those two-week intervals, Lyle shall have uninterrupted visitation. Delores is also entitled to exercise one two-week period of visitation exclusive of Lyle's rights each summer. Delores shall provide Lyle written notice no later than April 30 of each year of the weeks she has selected. Each party is further entitled to uninterrupted visitation during alternating spring breaks. Delores shall have visitation in even numbered years and Lyle shall have visitation in odd numbered years. Finally, the parties shall alternate visitation during Christmas break. In odd numbered years, Delores shall have visitation the first half and Lyle the second. The reverse is true in even numbered years. Lyle is further entitled to any additional visitation that can be agreed upon by the parties.

We expect Delores to support Lyle's relationship with the children as required by Iowa Code section 598.41(5)(*b*). Through liberal visitation and the exercise of joint legal custody, the children can realize the benefits of Lyle's continued involvement in their lives.

### B.  Property and Alimony Issues.

*1.     Legal Framework for Property and Alimony Issues.*

In dissolution-of-marriage cases, marital property is to be divided equitably, considering the factors outlined in Iowa Code section 598.21(1). Equitable distribution depends upon the circumstances of each case. *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005). An equitable division is not necessarily an equal division. *In re Marriage of Anliker*, 694 N.W.2d 535, 542 (Iowa 2005).

Alimony may also be awarded to a spouse in addition to the distribution of property. "Alimony 'is a stipend to a spouse in lieu of the other spouse's legal obligation for support.'" *In re Marriage of Probasco*, 676 N.W.2d 179, 184 (Iowa 2004) (quoting *In re Marriage of Francis*, 442 N.W.2d 59, 62 (Iowa 1989)). Whether alimony is awarded depends on the particular circumstances of each case. *In re Marriage of Spiegel*, 553 N.W.2d 309, 319 (Iowa 1996). Factors to be considered in awarding alimony are set forth in Iowa Code section 598.21A(1).

### 2. *Value of Marital Residence.*

Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence. *In re Marriage of Wiedemann*, 402 N.W.2d 744, 748 (Iowa 1987). In ascertaining the value of property, its owner is a competent witness to testify to its market value. *Holcomb v. Hoffschneider*, 297 N.W.2d 210, 213 (Iowa 1980). Although our review is de novo, we ordinarily defer to the trial court when valuations are accompanied by supporting credibility findings or corroborating evidence. *In re Marriage of Vieth,* 591 N.W.2d 639, 640 (Iowa Ct. App. 1999).

In this case, the district court accepted the valuation of $130,000 offered by Delores in her financial affidavit and in trial testimony. She testified that the figure was based upon an appraisal by a real estate agent. Lyle testified that the marital residence was worth $112,000 based upon a December 31, 2001 valuation performed by a certified appraiser.

While the court of appeals held that the district court erred in valuating the house at $130,000, we find that the district court's valuation of the marital residence was within the range of the evidence and, as a result, should not be disturbed.

### 3. *Distribution of Marital Assets and Debts.*

The second property issue is whether the trial court properly distributed marital assets and debts. The court of appeals found that the district court made a scrivener's error in its distribution table when it erroneously entered the figure $9,237 for Lyle's total liabilities and $7,952 for Lyle's net assets under the distribution plan. In fact, the numbers were transposed: the figure of $9,237 should have been entered as Lyle's net assets and $7,952 as Lyle's total liabilities. We agree with the court of appeals that this error should be corrected. When this error is corrected, the payment required by Delores to equalize the distribution of assets is reduced from $23,186 to $22,543.

Both the district court and the court of appeals granted Lyle a $541 deduction for an outstanding debt to J.W. McGrath. Mr. McGrath served as Lyle's initial counsel in these dissolution proceedings. This allowance is illogical considering that Delores was not given reciprocal credit for her litigation expenses. Attorneys' fees incurred in dissolution proceedings are not marital debt. *See Rodvik v. Rodvik*, 151 P.3d 338, 346 (Alaska 2006). It was, therefore, error to characterize the debt to J.W. McGrath as marital debt—it is Lyle's personal liability. The court, however, does have the discretion to make *an award* of attorneys' fees when equitable. *In re Marriage of Rosenfeld*, 668 N.W.2d 840, 849 (Iowa 2003). Such was the case here where Delores was awarded both trial and appellate attorneys' fees. To then allow Lyle a credit for his fees would thus be unequitable. While this debt is relatively minor it does affect Delores' equalization payment. The payment required by Delores to equalize the distribution of assets is reduced from $22,543 to $22,263.

With respect to the district court's distribution of credit card debt, we note that the Capital One credit card finances the Durango which Delores has been awarded. Further, the Discover credit card represents debt accumulated after the parties' separation. We see no basis for disturbing the trial court's disposition of these liabilities. While the AT&T credit card debt was marital debt, we believe it is equitable to require Delores to assume this liability as the level of debt was incurred without Lyle's knowledge and without his consent.

In determining the total assets retained by each party in the property division, both Lyle and Delores received deductions for obligations owed to relatives. The net value of Lyle's assets was reduced by $7,391 as a result of loans by Lyle's sister, Leigh A. Wolf, which were incurred after the parties separated. The net value of assets retained by Delores was reduced by $6,500 as a result of a loan obtained during the course of the marriage from Delores' parents. The loan Lyle obtained from his sister is not documented by a promissory note or other debt instrument. The loan from Delores' parents is documented, but payments on the loan have not been made over the past several years.

Delores claims that the trial court erred in assigning to Lyle a liability for an undocumented loan that may or may not be enforced. A similiar argument, however, can be made with respect to the loan from Delores' parents. Loans from family members are not the same as indebtedness to disinterested third parties. There is nothing fundamentally unfair with the district court's treatment of these liabilities, and we decline to disturb it on appeal.

### 4. Alimony.

Under Iowa law, alimony is not a matter of absolute right, but depends upon the circumstances of each particular case. *Anliker*, 694 N.W.2d at 540. Factors to be considered in awarding alimony are provided in Iowa Code section 598.21A(1). These factors include: (1) the length of the marriage, (2) the age and physical and emotional health of the parties, (3) the property distribution, (4) the educational level of the parties at the time of the marriage and at the time the dissolution action is commenced, (5) the earning capacity of the party seeking alimony, and (6) the feasibility of the party seeking alimony becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage. Iowa Code § 598.21A(1)(*a*)-(*f*).

Upon our de novo review of the record, we affirm the court of appeals' alimony award—$500 per month for a period of ten years. Factors which support the increase in amount and duration of alimony include the comparative income of the parties ($46,300 vs. $18,900), the lack of upward mobility for Delores, and the nature of the property division in which Delores assumes most of the marriage's high interest liabilities. *In re Marriage of Friedman*, 466 N.W.2d 689, 693 (Iowa 1991) (length of marriage, disparity of earning capacity); *In re Marriage of Hitchcock*, 309 N.W.2d 432, 436-37 (Iowa 1981) (earning capacity, present standard of living balanced against relative need of other spouse).

### 5. Child and Medical Support.

The record demonstrates that both child and medical support were improperly calculated in this case. The undisputed facts are that Lyle's income is $46,300, not the $43,000 used in determining child support payments. As a result, the court of appeals correctly ordered remand to the

district court for recalculation of the child support payment. In addition, on remand, the district court shall determine whether the proper level of child support has been impacted by the disposition of the joint physical care and visitation issues in this opinion.

With respect to medical support, the court of appeals correctly ruled that under Iowa Court Rule 9.12, after the first $250 per child is paid by the custodial parent, the remainder of uncovered medical expenses is to be split in proportion to the parents' incomes. On remand, the district court should correct this error.

### 6. *Attorneys' Fees and Costs.*

Delores seeks an award of appellate attorneys' fees. The court of appeals granted Delores $1,000 in attorneys' fees, with costs assessed to Lyle. In the exercise of discretion, we affirm the court of appeals, but do not award additional attorneys' fees and costs as a result of this further review.

## V. CONCLUSION.

The decision of the court of appeals is affirmed as modified. The decision of the district court is affirmed in part and reversed in part. The decision of the district court ordering joint physical care is reversed. Physical care of the children shall be awarded to Delores, with liberal visitation awarded to Lyle as described in this opinion. The decision of the district court to require Delores to pay Lyle $23,186 is reduced to $22,263. The district court's award of alimony at $300 per month for three years is reversed and increased to $500 per month, payable over a period of ten years unless Delores dies or remarries. The decision of the district court regarding child and medical support is reversed and remanded for

recalculation consistent with this opinion.  No further award of attorneys' fees is made on this appeal.

**DECISION OF THE COURT OF APPEALS AFFIRMED AS MODIFIED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED WITH INSTRUCTIONS.**