# IN THE COURT OF APPEALS OF IOWA

No. 22-0123
Filed October 5, 2022

**IN RE THE MARRIAGE OF ANDREW JAMES BURNHAM
AND ELIZABETH JO BURNHAM**

**Upon the Petition of
ANDREW JAMES BURNHAM,**
    Petitioner-Appellee,

**And Concerning
ELIZABETH JO BURNHAM,**
    Respondent-Appellant.

_____

    Appeal from the Iowa District Court for Scott County, Jeffrey D. Bert, Judge.

    A mother appeals the district court's decree granting joint physical care of her child between her and the child's father. **AFFIRMED.**

    Jennie L. Clausen of H.J. Dane Law Office, Davenport, for appellant.

    Wendy S. Meyer of Lane & Waterman LLP, Davenport, for appellee.

    Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**VAITHESWARAN, Presiding Judge.**

Elizabeth and Andrew Burnham married in 2017 and divorced four years later. They had one child, born in 2018. The district court granted them joint physical care of the child. *See In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007) ("Joint physical care anticipates that parents will have equal, or roughly equal, residential time with the child. Given the fact that neither parent has rights superior to the other with respect to the child's routine care, joint physical care also envisions shared decision making on all routine matters." (citation omitted)). Acknowledging Elizabeth was initially the primary caretaker, the court nonetheless found Andrew "stepped up and show[ed] that he [could] care for his" child "and be attentive to her needs." The court determined the child "would flourish under either parent's care" and both parents could "communicate civilly and effectively for the best interests of" the child, particularly "[a]s the wounds of their failed marriage heal[ed]."

On appeal, Elizabeth contends the court should have made her the physical caretaker. *See In re Marriage of Hansen*, 733 N.W.2d 683, 691 (Iowa 2007) ("If joint physical care is not warranted, the court must choose a primary caretaker who is solely responsible for decisions concerning the child's routine care." (citation omitted)). In her view, the court failed to give sufficient weight to her role as primary caregiver. *See id.* at 696 (examining "stability and continuity of caregiving"). That role, she argues, was especially important here, given the child's special needs. She asserts Andrew did not assist with the child's medical care prior to their separation, "continued to miss medical appointments after the separation," did not "properly use" the child's medical equipment, and "did not know the medical

providers."  She also notes that she "arranged her employment to be available" for the child on a full-time basis and was generally a "more suitable" parent.

Andrew conceded Elizabeth was the primary caretaker during the first year of the child's life.  He testified, "We had a division of duty, and hers was to take [the child] to her appointments, like any other marriage, and mine was to go to work."  But he also stated, "[H]ad [the division of duty] been flipped, and Liz was the one with the full-time career, you better believe I would have been right there in [physical therapy] with her and filling Liz in on what needed to be done."  He characterized the suggestion that he lacked interest in the child during that time frame as "preposterous," noting he would "give [the child] a bath" if Elizabeth was busy and would "cook dinner" about "75 percent of the time."  The result, he said, was "a real good flow of getting the daily tasks done."

After the district court filed a temporary physical care order, Andrew had the opportunity to care for the child independently, albeit on a limited basis.  While he lacked the same level of experience as Elizabeth in attending to the child's medical needs, that was largely due to the parents' agreed division of labor.  But, even if he had time to attend medical appointments, Elizabeth acknowledged only one parent was allowed to go to most of them during the height of the COVID-19 pandemic.  She conceded Andrew asked if he could be the parent taking the child to one of the appointments and she said no.

Despite Andrew's initial unfamiliarity with the child's medical protocols and his limited engagement, Andrew made concerted efforts to participate in her treatment regimen during the months preceding trial.  For example, he asked a

provider to make an exception to its one-parent attendance policy and, after the exception was made, he attended "every appointment."

The child's physical therapist corroborated Andrew's testimony. She split services between Elizabeth and Andrew's homes for several months, and she stated Andrew was "able to kind of balance putting task demands on [the child] with also trying to make it fun." He also "comfort[ed] her when she crie[d]" and "laugh[ed]" with her. She characterized the father-child interactions as positive. Notably, Andrew built a therapy room for the child, which she characterized as helpful.

The child's occupational therapist similarly testified Andrew "ask[ed] very good questions" and was "[v]ery interested in [the child's] development." While her schedule did not permit her to work as much with him on an in-person basis, she saw steady ongoing progress with the child and no regression. It follows that Andrew's belated involvement in the child's medical care did not compromise her development.

True, Elizabeth's employment allowed her to care for the child on a daily basis. But she had plans to return to school, and Andrew's supervisor testified he would have some flexibility to leave during working hours if needed. As for Elizabeth's contention that she was the more suitable parent, both parents had difficulty transitioning from young, single, "partying" lifestyles to the responsibilities of parenthood. As the district court stated, "[n]either approach[ed] the Court with clean hands." On our de novo review, we are persuaded Elizabeth's primary caretaking role and the attending circumstances did not militate in favor of placing the child in her physical care.

We turn to claimed communication difficulties between the parents, which Elizabeth contends should have resulted in rejection of a joint physical care arrangement. *See Hansen*, 733 N.W.2d at 697 (examining "the ability of the spouses to communicate and show mutual respect"). While communication was less than ideal, Andrew testified that "once [he] realized . . . what the outcome of this [was] going to be," he was forced to "to drop all the negative" and "focus on [the child] and move forward." Elizabeth also moved forward, working with Andrew in joint occupational therapy sessions. The therapist testified those sessions went "[j]ust fine" and the parents did not seem hostile or difficult with one another and put the child's needs first. Her professional opinion persuades us that the acrimony did not rise above what "usually accompanies a divorce." *In re Marriage of Ertmann*, 376 N.W.2d 918, 920 (Iowa Ct. App. 1985). The same holds true for the degree of conflict between the parents. *See Hansen*, 773 N.W.2d at 698. Both parents commendably set aside their differences in the interest of their child.

We are left with Elizabeth's argument that she and Andrew did not agree on daily matters. *See Hansen*, 733 N.W.2d at 697 (examining "the degree to which the parents are in general agreement about their approach to daily matters"). She relies on the claim that Andrew was unwilling to prioritize the child's medical care, a claim we have addressed. She also relies on the parents' inability to agree on a school district, an issue the district court resolved. Ultimately, both parents prioritized consistent treatment for the child. That was the single "daily matter" that mattered.

The district court thoroughly assessed the record and made cogent credibility findings. We give weight to those findings in light of the court's unique

ability to listen to the witnesses and watch them in person. *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984). On our de novo review, we conclude the district court acted equitably in granting the parents joint physical care of the child.

Both parents request appellate attorney fees. An award lies within our discretion. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). Because Elizabeth did not prevail on her request for physical care, we deny her attorney-fee request. *See In re Marriage of Hoffman*, 891 N.W.2d 849, 852 (Iowa Ct. App. 2016). As for Andrew's request, he has the financial ability to pay his appellate attorney fees. *See Sullins*, 715 N.W.2d at 255.

**AFFIRMED.**