# IN THE COURT OF APPEALS OF IOWA

No. 21-0415
Filed November 3, 2021

**TAYLER DAWN GARLAND,**
Petitioner-Appellant,

**vs.**

**BRANDON SCOTT DUNN,**
Respondent-Appellee.

_____

Appeal from the Iowa District Court for Louisa County, Mary Ann Brown,

Judge.

A mother appeals from a child custody, visitation, and support order.

**AFFIRMED.**

Roger A. Huddle of Weaver & Huddle Law Office, Wapello, for appellant.

Curtis Dial of Law Office of Curtis Dial, Keokuk, for appellee.

Considered by Tabor, P.J., and Greer and Badding, JJ.

**GREER, Judge.**

To resolve the custody dispute between these parents, the district court attempted to carefully balance the past care history with concerns for future stability. Tayler Garland, the mother of the child impacted by the court's custody determination, contends that balance is lopsided. She appeals the district court's decision to award the father, Brandon Dunn, physical care of their child. On appeal, she asks that we affirm the award of joint legal custody but designate her as the physical-care provider. As an alternative, she requests that the shared care schedule both parents followed during the temporary period of these proceedings remain in effect as the permanent care option. Depending upon our decision, she asks that we review the child support awarded. Under the record presented, we agree with the district court's determination over custody and child support.

**I. Background Facts and Proceedings.**

These parents,[1] Tayler and Brandon, had a child, A.D., in 2016. At the time of A.D.'s birth, the parents lived together in a home in rural Argyle that Brandon was purchasing from his grandfather. Brandon wanted Tayler to leave her job to stay home with A.D., which she did for a few months. She then began taking on a variety of temporary, part-time jobs while still providing most of A.D.'s care. Brandon's job during A.D.'s early years required him to work long hours. When both parents were working, each of their families provided support and childcare. Over the course of the relationship, the couple fought often and eventually

---

[1] Tayler and Brandon never married. At the time of trial, Tayler was twenty-eight years old and Brandon was twenty-seven years old.

separated in March 2018.  Both parents agreed that, between A.D.'s birth and the separation, Tayler provided the bulk of care for the child.

But this was the first of many breakups.  After the 2018 separation, Tayler and A.D. left Brandon's home[2] and moved back in with Tayler's grandparents[3] in Wapello.  During the ups and downs of the relationship, Tayler moved back and forth between her grandparents' home, Brandon's residence, and a trailer home in Mount Pleasant.  She moved to Washington starting in November 2020.  At the time of trial, Tayler resided in the Washington home.  From 2016 until trial, Brandon remained in the Argyle home.  Throughout these changes and before the court filings, Tayler maintained physical care of A.D.

Both parents are employed.  After A.D.'s birth, Tayler shifted back into the permanent work force and by the time of trial worked nights[4] in an envelope factory in Mount Pleasant.  When she is working, her grandparents in Wapello or sister and mother in Burlington watch A.D.  Before the temporary visitation was established, Brandon would occasionally spend time with the child for a weekend, but he did not have regular visitation.

Brandon has also had a variety of jobs since A.D.'s birth.  During the bulk of A.D.'s life, however, Brandon worked at a train wheel factory.  He eventually quit this job because of a pandemic-induced shortage of work and his own respiratory health.  He now works on his step-grandfather's farm as a farmhand.  In September 2020, Brandon became sick and was unable to work full time, but he testified at

---

[2] Tayler asserts Brandon "kicked us out."
[3] Tayler's grandparents raised her and continue to be an active part of her and A.D.'s lives.
[4] Tayler works swing shifts on varying days from 5:30 p.m. to 5:30 a.m.

the January 2021 trial that he was recovering and would be back to full-time work. When A.D. was with Brandon, either Brandon's work schedule allowed him the flexibility to take care of A.D. or his mother would care for A.D. Brandon's parents live minutes away from him.

In early 2020, Tayler and Brandon were working through their issues and announced their engagement to be married. However, they hit another rough patch and Tayler left the house once more. Tayler already had a trip planned out of state to see her father, and Brandon kept A.D. while she was gone. During Tayler's trip, Brandon became worried that Tayler might eventually move closer to her father and take A.D. with her. So Brandon applied for a temporary injunction to prohibit removal of A.D. out of the state. The same day, Tayler filed a pro se petition for custody and child support. Without a hearing, the district court issued an order for temporary injunction against Tayler, prohibiting removal of the child. Next, at the required mediation on temporary matters, Tayler and Brandon agreed to a temporary arrangement sharing physical care of A.D. on an alternating weekly basis. Because they agreed to share expenses of the child, no support payments were required from either parent. Yet with this mediated agreement in place, in the summer of 2020 the parties proceeded with a temporary custody hearing on affidavits. Ultimately, the district court ordered the same shared physical-care and child-support arrangement Tayler and Brandon earlier agreed to in mediation.

Prior to the temporary schedule, Tayler asserts that Brandon did not regularly participate in A.D.'s day-to-day care or financially share in the child's expenses except for the expense of the preschool Brandon wanted A.D. to attend. However, the preschool shut down with the COVID-19 pandemic. And, after the

temporary schedule began, Brandon became more involved in the day-to-day care of A.D. On weeks when A.D. was in his care, Brandon's work schedule allowed him to care for A.D. or Brandon's mother would watch him. Tayler enrolled A.D. in preschool close to her sister in Burlington, one hour from Tayler's home, which he attended on the weeks he was in her care. She wanted A.D. to go to preschool with his same-age cousin and to have them both continue in the school system in Burlington for kindergarten. For A.D.'s elementary school education, Brandon's plan was for A.D. to jump on a bus and go to kindergarten in the school district in Brandon's home area.

Yet, neither parent expressed strong concerns about the other's parenting apart from differences in disciplinary tactics. Both still rely on their families for help; however, while Tayler's family members live in separate towns across southeast Iowa, Brandon's mother lives about five minutes from him and he works with his father and for his step-grandfather.

Trial to determine the permanent custody of A.D. occurred in January 2021. As the parties described their current living arrangements, the district court directed questions and focused on A.D.'s future school plans for when kindergarten started in the fall of 2021. When pushed by the court, Tayler said she was willing to consider other schooling and care options closer to her home in Washington. Tayler and Brandon also contemplated sending A.D. to school somewhere between their two homes.

Finding that both parents believed the other was a good parent, the district court opined that joint physical care would be ideal for this family. A.D. seemed to be doing well with the split schedule, and the parents were managing the shared

time well. And, it is abundantly clear that both parents love A.D., have supportive families that assist in childcare, and have been appropriate childcare helpers. However, in the district court's view, the distance between their homes made the shared-care option untenable, especially with the child's schooling fast approaching. The court believed that Brandon could provide A.D. more stability— he had lived in the same home since 2016, had a job with daytime hours, had family close by, and had a more realistic plan for A.D.'s schooling. The court found that Tayler, on the other hand, had a plan that would require physical care of A.D. to rely too heavily on her mother and sister.[5] This lack of stability overshadowed her history as A.D.'s primary caregiver.

Ultimately, the court determined that Brandon would have physical care of the child. The parents would alternate weeks until A.D. started school, and then Tayler would have A.D. every other weekend and nearly half the summer. Tayler was also ordered to pay $400 per month in child support. Tayler now appeals.

**II. Standard of Review.**

As this case was heard in equity, our review is de novo. Iowa R. App. P. 6.907. Especially when considering the credibility of witnesses, we give weight to the fact findings of the district court, but are not bound by them. Iowa R. App. P.

---

[5] We would point out that an expanded role by grandparents does not always weigh against stability, especially when the grandparents have long been involved in the child's life. *See In re Marriage of Welbes*, 327 N.W.2d 756, 758 (Iowa 1982) ("No matter which parent has custody, [the child] is foredoomed to get much of her care and early training from others. Since this is true, we believe the grandparents are to be preferred over the ministrations of strangers."); *Meller v. Hendrickson*, No. 19-1096, 2020 WL 374565, at *3 (Iowa Ct. App. Jan. 23, 2020) ("Given the long-term care role of the grandparents, however, it is not for us to rebuke that relationship as inappropriate when both parents have benefitted from that expanded role.").

6.904(3)(g). "Physical care issues are not to be resolved based upon perceived fairness to the [parents], but primarily upon what is best for the *child.*" *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007) (emphasis in original).

## III. Analysis.

Tayler argues that the court wrongly granted Brandon physical care or, at the very least, should have continued the joint physical care arrangement. She also asks us, assuming we modify the physical-care arrangement, to adjust the ordered child support accordingly. We take each concern in turn.

### A. Shared physical care.

The district court ruled the one-hour driving distance between Tayler's and Brandon's residences, especially now that the child is heading to kindergarten, made shared care impractical. Tayler asserts the distance between them has not caused any disruption because of her efforts to make things run smoothly for the child. But we look past convenience to the parents over the practical impact upon the child over the long haul.

Iowa Code section 598.41(3) (2020)[6] outlines factors the court considers when determining what custody arrangement is in the best interest of a minor child. *See Hansen*, 733 N.W.2d at 696 ("[W]e have held that the factors listed here as well as other facts and circumstances are relevant in determining whether joint physical care is in the best interest of the child."). One of these factors is "[t]he geographic proximity of the parents." Iowa Code § 598.41(3)(h). Our case law

---

[6] Iowa Code section 600B.40(2) directs that, when "determining the visitation or custody arrangements of a child born out of wedlock," we look to the factors enumerated in section 598.41. *See In re Coats*, No. 06-0452, 2006 WL 2265488, at *1 n.1 (Iowa Ct. App. Aug. 9, 2006).

makes clear that geographic distance alone between co-parents can make joint-care agreements unfeasible, especially as "the stress of the commute falls on the child disproportionately." *Thorpe v. Hostetler*, 949 N.W.2d 1, 6–7 (Iowa Ct. App. 2020) (stating that a mother's move one hour away meant the previous shared-care arrangement was no longer in the child's best interests); *see also Teggatz v. Ellingson*, No. 19-1816, 2020 WL 2065944, at *2 (Iowa Ct. App. Apr. 29, 2020) (finding the hour travel time between the parties' homes was a "major obstacle" to joint physical care); *In re Marriage of Slayman*, No. 16-1240, 2017 WL 2181865, at *3 (Iowa Ct. App. May 17, 2017) (declining to award joint physical care because a ninety-eight mile commute was not in the best interest of the child); *Fitch v. Wurtz*, No. 12-1646, 2013 WL 988897, at *3 (Iowa Ct. App. Mar. 13, 2013) (noting that relocation of a parent to location more than fifty miles away may deprive a child of the benefits of joint physical care, ultimately requiring a change in the plan); *In re Marriage of Scurr*, No. 11-1905, 2012 WL 2122306, at *1 (Iowa Ct. App. June 13, 2012) (declining to award joint physical care because a forty-five minute commute was not in the best interest of the child); *In re Marriage of Metcalf*, No. 06-0324, 2006 WL 3018228, at *1 (Iowa Ct. App. Oct. 25, 2006) (finding that a move out of a child's school district requiring a drive of one hour or more between homes makes a joint physical care arrangement unworkable). The district court was correct in not entertaining a shared care arrangement as, given the circumstances of this case, a joint-care arrangement for A.D. is not appropriate.

**B. Physical care.**

We turn, then, to determine if we agree with placing physical care with Brandon. "When joint physical care is not warranted, the court must choose one

parent to be the primary caretaker, awarding the other parent visitation rights." *In re Marriage of Bain*, No. 07-0333, 2008 WL 4325499, at *2 (Iowa Ct. App. Sept. 17, 2008). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695. "[T]he factors of continuity, stability, and approximation are entitled to considerable weight." *Id.* at 700. "These factors favor a parent who was primarily responsible for physical care of the children," though we examine each case's unique facts. *Bain*, 2008 WL 4325499, at *3.

We agree with the district court that both Brandon and Tayler would be appropriate physical custodians. Both had proven success in caretaking during the temporary period leading up to the trial. So, this case, then, involves a balancing act. It is undisputed that, before the court ordered shared care of A.D. in May of 2020, Tayler was doing the lion's share of the caretaking. Each time she and Brandon separated, A.D. remained with Tayler. Still, future stability is crucial to meet A.D.'s best interests. And here, the barriers to shared care impact the determination of physical care; as the district court said, Tayler's long-term plan for the child's schooling is unrealistic. Although a stable provider for A.D., Tayler established a care plan that requires her to drive A.D. one hour to and from school every day without any recognition of the challenges that might bring. The district court described the chaotic schedule:

> She lives in one city, works in another city, plans on the child to attend school in a third city, and her childcare is in the third city. Even though not specifically in the record, it is common knowledge Washington, Iowa is approximately one hour from Burlington and a half hour from Mt. Pleasant. Mt. Pleasant is about a half hour from

Burlington. She has not even contemplated making child care arrangements in the city where she lives. There is no practical way that she can make it work on a day-to-day basis to have the child attend school in Burlington, while she lives in Washington and works in Mount Pleasant. The only way for that to work is for her to turn over de facto physical care of her child to her sister and mother, who live in Burlington.

Likewise, Tayler also offered no plan that would complement her work schedule and allow A.D. to go to school in Washington[7] if she enrolled A.D. in school in the town where she lives. Brandon, on the other hand, has a living arrangement that allows A.D. to ride the bus to school, a job with flexible daytime working hours, and family close by when extra support is needed. *See, e.g.*, *In re Marriage of Brown*, 778 N.W.2d 47, 54 (citing more flexible work hours as a positive change in the father's favor). And, we note that Brandon has carried more of the care-taking load since the temporary custody order.

Finally, the district court had the opportunity to see both parents and judge their credibility. We are not bound to these determinations, but we do give them weight. *See* Iowa R. App. P. 6.904(3)(g). Given the narrow margins dividing Brandon and Tayler, we are persuaded by the district court's determination that, as it stands, Brandon is better suited to act as A.D.'s primary physical custodian.

**C. Child support.**

As we do not modify the custody arrangement established by the district court, we do not change the child-support award.

---

[7] When asked why she lived in Washington instead of maintaining a residence closer to Brandon's home or to her work, Tayler said, "Well, I like Washington. It's very clean. And, like, I don't know. I just really like that town, so I decided to move there. And plus I found a trailer that's really nice. I thought it was a perfect little home for us."

**IV. Conclusion.**

Because the distance between Brandon and Tayler makes a shared-care arrangement untenable, we must choose one parent to have physical care of A.D. Given the greater stability and consistency that Brandon's plan for A.D.'s future provides, we affirm the district court's ruling that he have physical care. As such, we do not modify the existing child support order.

**AFFIRMED.**