In re the MARRIAGE OF Laura Kate ELLIS and James M. Ellis.

Upon the Petition of Laura Kate Ellis, Petitioner–Appellee,

and

Concerning James M. Ellis, Respondent–Appellant.

No. 04–1449.

Court of Appeals of Iowa.

Sept. 14, 2005.

Margaret Lainson of Meardon, Sueppel & Downer, Iowa City, for appellant.

John Hayek and Alison Smith of Hayek, Hayek, Brown, Moreland & Hayek, L.L.P., Iowa City, for appellee.

Heard by VOGEL, P.J., and MILLER and HECHT, JJ.

MILLER, J.

James Ellis appeals the physical care provisions of the decree dissolving his marriage to Laura Ellis. He contends the

court erred in not granting his request for joint physical care of the parties' minor son, Paxton. He argues that joint physical care is in the child's best interests. We modify to award joint physical care and remand for further proceedings.

## I. BACKGROUND FACTS AND PROCEEDINGS.

Laura and James were married on May 25, 1996. Laura filed a petition for dissolution of marriage on September 5, 2003. Trial was held on her petition August 3 and 4, 2004.

When the parties were married Laura had just graduated from the University of Georgia with a Bachelor of Science degree in secondary education. James earned a bachelor's degree in music from Western Michigan University in 1991, with cello as his primary instrument. He met Laura at the University of Georgia while working on his master's degree in music, which he received in 1994. After they married the parties moved to Iowa City because James had been accepted to a doctoral music arts program at the University of Iowa. After briefly holding other jobs, Laura took a job with National Computer Systems (NCS) in Iowa City in January 1997. She was still employed there at the time of the dissolution trial. James completed his doctorate in 1998. At the time of trial he was teaching music at Cornell College and playing with several different Iowa symphonies. James also gives private cello lessons out of his home.

The parties' only child, Paxton Ellis, was born December 22, 2002. He was nineteen months old at the time of the trial. Laura stayed home for approximately three months after Paxton's birth and provided his primary care. James was teaching at Wartburg College but was also actively involved in Paxton's care during this time. In March of 2003, Laura went back to work at NCS, working approximately 7:30 a.m. to 4:00 p.m. Monday through Friday. When the Quad City Symphony season and James's teaching obligations were completed in April 2003 he became Paxton's primary care giver while Laura worked during the weekdays. Laura, however, continued to be actively involved in Paxton's care during this time and cared for him during the evenings while James taught private lessons or was involved in various symphony activities. At trial each party was complimentary of the other party's parenting skills.

The parties separated in October 2003 when Paxton was a little over ten months old. After the separation they almost equally shared Paxton's care, in accordance with their work schedules. Initially, James had Paxton every weekday, Laura had him every weeknight, and they would alternate weekends. During mediation in February 2004 it was agreed they would try a new schedule, proposed by James but agreed to by both parties. James would take care of Paxton during the weekdays while Laura worked, from approximately 6:30 a.m. to 4:00 p.m. Paxton would then spend Monday and Tuesday evenings and overnights with Laura, Wednesday and Thursday evenings and overnights with James, and they would then alternate the Friday, Saturday, and Sunday weekends. During the summer some of James's weekday private cello lessons in the home would occur during the daytime and at those times Paxton would have to be with a babysitter, approximately eight hours per week. Laura testified that Paxton seemed to be well adjusted to this present schedule and happy in both homes. However, her objection to the schedule is that there are times when it would be possible for her to go for five consecutive days without seeing Paxton.

Although Laura agreed Paxton was doing well with this shared physical care arrangement, and that James was a good parent, she requested the court grant her physical care and reject James's request for joint physical care. Laura agreed they had been able to cooperate for the most part and to make certain Paxton saw both parents on a regular basis, but also testified that the reason they had been able to work out shared care was because she had usually gone along with what James wanted. She also agreed that it would be possible for the parties to cooperate to ensure Paxton's success in a shared care arrangement if compromise was involved. However, she objected to joint physical care because she believed it would lead to more conflict and problems over the course of Paxton growing up than if one parent were able to make the decisions concerning Paxton.

Although Laura stated that at times since they had separated she and James had been able to reasonably discuss matters about Paxton, she felt that at other times James had issued "ultimatums" without opportunity for discussion. The main example given by Laura of the parties' inability to communicate about decisions regarding Paxton was the fact James had not consulted her about having a baby-sitter to watch Paxton for eight hours per week during the summer while he taught private cello lessons.

Laura testified that she had both a personal objection to joint physical care and did not think it would be best for Paxton. In response to a question on cross-examination concerning whether basically she wanted to be the parent that makes the decisions, Laura answered she wanted to be able to work with James to make decisions "but, yes, I would in the event that it's something that we cannot agree on, I would like to be the parent who makes the

decision." She agreed the parties should have joint legal custody of Paxton.

James testified that if joint physical care were ordered as he was requesting he and Laura would be able to communicate and cooperate for Paxton's benefit. He believes joint physical care is in Paxton's best interest because at all times since Paxton's birth the parties have fully shared in his upbringing. He hoped that could continue. James testified that if the court did not order joint physical care his second choice would be that physical care of Paxton be placed with him. However, he still believed joint physical care was best because both parties are Paxton's parents, they both want what is best for him, and they would make the best decisions for him together. With regard to the summer babysitter issue, James agreed he should have specifically told Laura he was going to have a sitter for eight hours per week. However, James testified that he thought Laura would know he was going to have to do so because it had been necessary to do so the previous summer, when the parties were still living together, and she was well aware of that arrangement.

Both parties agreed that James had a problem with alcohol in the past which culminated in an incident on a Friday in July 2003 when James got drunk. Laura testified she was afraid to go to sleep because she thought he would disappear with Paxton. She stated she thought he might take their vehicle and Paxton and try to drive, and if he had done so he could have killed himself or Paxton. James testified he remembered drinking on the day in question and that it was the first and only time he had drank while Paxton was in his sole care. He remembered having a beer at a friend's house, having more after he got home, and that he was cooking a meal when Laura got home around 4:00

p.m. However, James stated he does not remember anything that took place that night after dinner. The next thing he remembered was waking up the next morning with a terrible hangover, Laura's mother was there, and he could tell "people were not happy."

After this incident James decided to stop drinking. However, by the following Monday morning James actually felt worse and was dizzy. He was concerned enough to call Laura's parents because her mother is a nurse. They came over and took James to the hospital where he was treated for dehydration. James testified he was never formally diagnosed as an alcoholic or told that he suffered from alcoholism but decided on his own that he had a problem with alcohol. He saw an alcohol and drug counselor for four sessions and attended Alcoholics Anonymous meetings. James testified he entirely stopped drinking for six months, kept no alcohol in his home, had not abused alcohol since the incident in July 2003, and drank only one or two drinks about four nights a month on social occasions and then only when he is not caring for Paxton. James acknowledged he had smoked marijuana until July 2003, but testified he had not smoked marijuana or used any other types of illegal substances since then.

After the July 2003 incident involving alcohol the parties continued to reside together for over three months during which time James continued to provide for Paxton's daily care. Although at trial Laura testified that she has at times thought about and has been "scared" about the possibility of James drinking while he is watching Paxton, from the time Laura left the family home in October 2003 to the time of trial James continued to provide daily care for Paxton while Laura worked and Laura voiced no concerns on the issue.

Laura testified she had not seen James drink since the July 2003 incident.

The district court filed written findings of fact, conclusions of law, and a decree of dissolution on August 19, 2004. It ordered joint legal custody of Paxton but denied James's request for joint physical care and instead placed physical care with Laura. James appeals.

## II. SCOPE AND STANDARDS OF REVIEW.

■ We conduct a de novo review of physical care awards. *In re Marriage of Murphy*, 592 N.W.2d 681, 683 (Iowa 1999). Our overriding consideration is the child's best interests. *In re Marriage of Ford*, 563 N.W.2d 629, 631 (Iowa 1997). We give weight to the fact findings of the district court, especially when considering the credibility of witnesses, but are not bound by them. Iowa R.App. P. 6.14(6)(*g*).

## III. MERITS.

The district court found, in part, that the parties "have had problems in some communications and agreement as to decisions," and that "[James] has had some serious substance abuse problems in the past." In its conclusions of law the court stated, in part:

Under Iowa law there is a preference for joint custody with physical care granted to one parent and liberal visitation to the other....

Joint physical care or shared care is disfavored. [Citations]. All of the cited cases clearly require that the parents be able to communicate and cooperate with each other and respect each other's parenting and lifestyles. Further, the arrangement must be shown to be in the best interests of the child and would foster a relationship with both parents.

Iowa Code Section 598.41(5) was amended effective July 1, 2004, to allow

joint physical care upon the request of either party. If the request is made, a denial by the court must include specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the children.

In the "Decision" portion of its ruling the district court stated, in relevant part:

The primary decision in this case is whether the parties shall share physical care or have the more common primary physical care division. There is no question that either parent is capable of raising Paxton alone or having primary physical care of Paxton alone or having primary physical care of Paxton with very liberal visitation for the other. It is equally clear that shared care will not work in this case if shared care means sharing decisions. The Findings of Fact describe a relationship in which [James] has been unwilling to compromise when [Laura] does not agree with his point of view. [Laura] is not willing to concede all important issues to [James] when there is a disagreement. One of the cornerstones of shared physical care is the ability to communicate and reach mutually agreeable decisions. The court has no confidence in the ability of the parties to reach mutually agreed decisions. The court has a substantial concern that in a crisis or important decision, [James] will not be willing to consider a contrary view of [Laura]. Not only would this lead to conflict between the parties, it would tend to teach Paxton destructive concepts in communication and relationships. The court will not grant shared care in this case.

The court further stated:

The more difficult decision is the choice of the party to be granted primary physical care. The parties love Paxton very much and have done an excellent job to this point in raising their son. The court is confident that Paxton will thrive with either parent. However, a choice must be made.

The court found the primary difference between the parties to be a history of substance abuse by James, not shared by Laura. Based on this history, together with a concern about a potential for James to use alcohol at some future time, the court awarded Paxton's physical care to Laura and "very liberal visitation" to James.

James first claims the district court ignored the legislative mandates of amended Iowa Code section 598.41(5) in denying his request for joint physical care. In 2004 the Iowa General Assembly amended Iowa Code section 598.41(5) to read, in relevant part, as follows:

If joint legal custody is awarded to both parents, the court may award joint physical care to both joint custodial parents upon the request of either parent. If the court denies the request for joint physical care, the determination shall be accompanied by specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child.

2004 Iowa Acts ch. 1169, § 1 (now codified at Iowa Code § 598.41(5) (2005)). This provision became effective July 1, 2004, and applies in this case, which was tried and decided in August 2004. James argues that the district court's findings do not meet the requirement for specific findings of fact as to why joint physical care is not in the child's best interest. He further argues that following the 2004 amendment joint custody and joint physical care are the preferred custodial arrangements; that by holding Iowa continues to disfavor joint physical care the court mistakenly relied on outdated case law; and that the court thus erred in failing to adopt and apply the change in law effected by the

2004 amendment. Laura argues in response that the court's decision, when read as a whole without undue focus on any particular sentence, does comport with the requirement for specific findings of fact and is not otherwise affected by error as claimed.

■ We agree with James that joint physical care no longer remains generally disfavored. In 1997 our General Assembly amended the relevant portion of section 598.41(5) to read, in part:

> Joint physical care may be in the best interest of the child, but joint legal custody does not require joint physical care. When the court determines such action would be in the best interest of the child and would preserve the relationship between each parent and the child, joint physical care may be awarded to both joint custodial parents or physical care may be awarded to one joint custodial parent.

*See* 1997 Iowa Acts ch. 175, § 199 (previously codified at Iowa Code § 598.41(5) (2003)). Citing that amendment, we thereafter stated:

> Although there is a multitude of case law stating joint physical care is strongly disfavored, the legislature recently proclaimed joint physical care a viable

disposition of a custody dispute if in the best interests of the children. If the parents of the children are able to cooperate and respect each other's parenting and lifestyles, a joint care arrangement can work.

*In re Marriage of Walton*, 577 N.W.2d 869, 870 (Iowa Ct.App.1998) (citations omitted). We thus believe that this 1997 legislation disavowed the general bias against joint physical care, finding it to be a viable disposition provided it is in the best interest of the affected child or children and the parents are able to appropriately communicate and cooperate.

We disagree, however, with James's argument that following the 2004 amendment joint physical care is a preferred custodial arrangement.[1] The 1997 legislation for the first time defined "joint physical care," *see* 1997 Iowa Acts ch. 175, § 183 (now codified at Iowa Code § 598.1(4) (2005)), and the 1997 amendment to section 598.41(5) repeatedly employed the permissive term "may" when speaking of the court's ability to award joint physical care. Following the 2004 amendment, section 598.41(5) still provides that the court "may" award joint physical care. The statute's language following the 1997 amendment, as well as its language follow-

---

1. Iowa's General Assembly has on numerous occasions, including occasions in relatively recent years, demonstrated its ability to expressly state when "preference" is to be given to a class of persons or to a course of action. *See, e.g.,* 2003 Iowa Acts ch. 145, § 30 (codified at Iowa Code § 8A.311(1) (2005)) (requiring that in the purchasing of equipment, supplies, or services by the department of administrative services through competitive bidding "[p]reference shall be given to purchasing Iowa products and purchases from Iowa-based businesses...."); 1996 Iowa Acts ch. 1174, § 7 (codified at Iowa Code § 600.7A (2005)) (requiring department of human services to adopt rules providing that if adoption services are provided by the department the overriding criterion shall be a "preference for placing a child in a stable home environment as expeditiously as possible."); 1978 Iowa Acts ch. 1088, § 41 (codified at Iowa Code § 232.80 (2005)) (directing, in child in need of assistance proceedings, that homemaker-home health aide services in a child's place of residence "shall be provided in preference to removal of the child from the home."); 1974 Iowa Acts ch. 1172, § 11 (requiring that in employing personnel the then newly-created area education agencies "shall give preference" to qualified personnel who sought employment because their employment by county school systems and joint county systems was ending); 1904 Iowa Acts ch. 9, § 1 (now codified as part of Iowa Code ch. 35C (2005)) (establishing "preference in appointment and employment" for veterans).

ing the 2004 amendment, constitutes neither a ringing endorsement of joint physical care, nor a mandate for courts to grant joint physical care unless the best interest of the child requires a different physical care arrangement.

■ We also disagree with James's argument that the district court's findings of fact do not meet section 598.41(5)'s requirement that a court rejecting a party's request for joint physical care make specific findings of fact as to why joint physical care is not in a child's best interest. The court expressly recognized the statutory requirement for such findings. It found the parties had "problems in some communications and agreement as to decisions." It later reasoned that its findings described a relationship in which James had been unwilling to compromise when Laura does not agree with his point of view. We agree with Laura that a court rejecting a request for joint physical care is not required to parrot the specific wording of section 598.41(5) by stating a finding in the specific terms that "the awarding of joint physical care is not in the best interest of the child [because]...." We also agree that the court's decision, when read as whole, does comport with the requirement for specific findings of fact in rejecting joint physical care.

We are left to consider whether, after giving appropriate weight to the district court's findings of fact, we agree with those findings and the court's resulting reasoning and conclusions rejecting joint physical care. Because the court's view that joint physical care remains generally disfavored may have informed and influenced its decision, we carefully review the record to determine whether we agree with its findings, reasoning, and ultimate rejection of joint physical care.

The district court found that the parties had had "problems in some communica-

tions and agreements as to decisions." This was based on findings that Laura had testified James had not been able to share decision making with her, when the parties were unable to agree the decisions were made by James without her consent, when she attempted to discuss conflicts James would not compromise, she felt verbally attacked when the parties could not reach agreement, and James made changes without her input which resulted in him having increased time with Paxton and her having less. The court concluded that although either parent was capable of raising Paxton alone, or having his physical care with the other parent having very liberal visitation, joint physical care would not work because as a result of James's unwillingness to compromise the parties would be unable to reach mutually agreed decisions. For the reasons that follow we disagree to some extent with the court's findings, and we respectfully disagree with its resulting decision to reject joint physical care.

The district court's rejection of joint physical care was based on its view that the parties had been unable to reach shared decisions concerning Paxton, and would be unable to do so in the future, all largely as a result of James's unwillingness to compromise when the parties had differing opinions. The court's belief on this point was based largely upon Laura's testimony. We have in the preceding paragraph briefly summarized the court's principal findings concerning her testimony. Those findings and our review of the record reveal the very general nature of Laura's complaints. Her principal example of James's unwillingness to compromise is her complaint that in the summer of 2004 he did not consult her about having a babysitter for Paxton eight hours per week on the weekdays she was working, he had Paxton, and he gave some cello lessons during the daytime hours. However, as

previously noted James acknowledged he should have discussed the matter with Laura, but he also points out that she was or should have been well aware of his need for the babysitter as his situation was the same as it had been while the parties were still living together during the prior summer. The record is for all practical purpose devoid of other concrete examples of events causing Laura's complaints.

It appears the parties' communication and cooperation has not at all times been the best, and probably more of the fault lies with James than with Laura. However, when a marriage is being dissolved we would find excellent communication and cooperation to be the exception and certain failures in cooperation and communication not to be surprising.

We also note and place great emphasis upon the parties' highly successful shared care of Paxton from his birth to the time of the dissolution trial. The district court found that "[s]ince the separation of the parties, they have essentially shared care of Paxton." This finding somewhat understates the extent of the parties' shared care, for the record in fact shows that they have almost equally shared Paxton's care since his birth, although each has at times provided somewhat more of his care than the other has. In findings fully supported by the record and with which we agree the court also found that "each parent is complimentary of the training and care of Paxton by the other," "Paxton is well adjusted, happy and thriving," and "[b]oth parents live relatively close to each other at this time and expect that Paxton will be involved in school activities close to their current residences." As we have earlier noted, the court also believed that either parent was capable of raising Paxton alone or having his physical care, with the other parent having very liberal visitation. At the time of trial the family had been living according to a shared physical care arrangement for the ten months since their separation. Paxton has thrived in the parties' shared care, both before and after their October 2003 separation.

## IV. SUMMARY.

■ Laura's complaints of communication and cooperation failures are general in nature and not surprising in the context of a dissolution of marriage. Her primary concrete example of such failures has minimal significance. The parties have, both before and after their separation, been highly successful in their shared care of Paxton, resulting in a happy, healthy, thriving child. The parties have kept Paxton's best interests in mind and made what amounts to a joint physical care arrangement work successfully.

## V. CONCLUSIONS AND DISPOSITION.

We conclude joint physical care will best assure Paxton the opportunity for the maximum continuing physical and emotional contact with both parents and will best encourage his parents to share the rights and responsibilities of raising him. We conclude a joint physical care arrangement most effectively serves Paxton's best interest. We therefore conclude the district court should not have rejected James's request for joint physical care and should have awarded the parties joint physical care of Paxton.

We modify the decree of dissolution to provide that the parties shall have joint physical care of Paxton. We therefore vacate the trial court's child support order, which was based on Paxton's physical care being placed with Laura. The record does not indicate that the parties fully agree on the schedule or details of a joint physical care arrangement. We therefore remand

to the district court for such further proceedings as are necessary to establish a joint physical care schedule and to resolve any other issues that may arise as a result of our modification of its decree. Costs on appeal are taxed three-fourths to Laura and one-fourth to James.

**AFFIRMED AS MODIFIED AND REMANDED.**