# IN THE COURT OF APPEALS OF IOWA

No. 22-0041
Filed January 25, 2023

**IN RE THE MARRIAGE OF MATTHEW CALVIN HARPER
AND STEPHANIE MAE HARPER**

**Upon the Petition of
MATTHEW CALVIN HARPER,**
        Petitioner-Appellee,

**And Concerning
STEPHANIE MAE HARPER,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Linn County, Ian K. Thornhill, Judge.


        A wife appeals the district court's grant of physical care to the husband, division of a retirement account, the calculation of her spousal support, and award of attorney fees. **AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**


        Thomas J. Viner of Viner Law Firm P.C., Cedar Rapids, for appellant.

        Rachel R. McCrate of Gray, Stefani, & Mitvalsky, P.L.C., Cedar Rapids, for appellee.


        Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Matthew Harper petitioned to dissolve his marriage with Stephanie Harper in 2019. When their trial date came around, Stephanie requested a continuance because of a potential COVID-19 exposure, which the district court granted. Following the dissolution trial nine months later, the district court gave Matthew physical care of the couple's two children, divided Matthew's retirement accounts using their values as of the original trial date, and ordered him to pay $10,000.00 toward Stephanie's attorney fees. Stephanie appeals, arguing the district court should have awarded joint physical care, divided the retirement accounts as of their actual trial date, and awarded her full attorney fees. Matthew asks us to affirm; he also requests an award of appellate attorney fees. Because joint physical care is not in the children's best interests and we find no abuse of the trial court's discretion in its award of attorney fees, we do not disturb those portions of the decree. But, because equity typically requires marital assets be divided on the date of the dissolution and we find no facts mandating an alternate date here, we modify the decree and remand so the district court can file appropriate qualified domestic relations orders (QDRO).[1]

**I. Background Facts and Prior Proceedings.**

Stephanie and Matthew were married in June 2010 and have two children, ages ten and seven at the time of trial. After their first child was born, Stephanie forwent working outside of the home to care for the child full time and avoid the

---

[1] Our original opinion in this case, filed January 11, 2023, was vacated when we granted Matthew's petition for rehearing. *See* Iowa R. App. P. 6.1204(5) ("If the petition for rehearing is granted, the decision of the court of appeals is vacated and the court of appeals shall retain jurisdiction of the case.").

cost of daycare. Matthew continued working as an engineer, a job he still had at the time of the dissolution hearing.

In 2016, Stephanie left the home with both children and did not return. Stephanie filed a temporary protective order claiming Matthew was physically abusing her and the children. Days later, police found her wandering down the middle of a street with both children around 2:30 a.m.; they took her to the hospital for a mental-health evaluation. Stephanie was hospitalized, but because of the protective order, the children could not be placed with Matthew. The Iowa Department of Human Services (DHS) removed the children from Stephanie's care, adjudicated them children in need of assistance (CINA), and placed them with a family friend. Soon after, the protective order was dismissed and, while the CINA cases stayed open, the children were returned to Matthew's custody.

Stephanie remained out of the family home until 2018 while she engaged with mental-health treatment. During this time, Matthew was the sole caregiver for the children. The older child was exhibiting challenging behaviors before Stephanie left the home, but Matthew was able to adjust his parenting style and establish a routine that mitigated these issues.

In 2018, Stephanie moved back into the family home. DHS recommended the CINA case be closed because Stephanie had addressed her mental-health concerns and appeared stable since April 2017, and the juvenile court agreed.

The relationship began to deteriorate, however, and Matthew petitioned for dissolution of the marriage in January 2019. In February, Stephanie left the family home and moved into an apartment. Without Matthew's consent, she took the children with her, stating she would only allow him supervised time with the

children until he agreed to a joint-care arrangement. Matthew filed an emergency motion for a temporary injunction requiring the children to reside in the family home, which the district court granted. Within hours, Stephanie filed a petition for relief from domestic abuse, alleging Matthew had assaulted her—the petition was dismissed when the court found no assault occurred.[2] She also moved to vacate the temporary injunction, but the motion was denied. Stephanie and the children moved back into the family home. Both Matthew and Stephanie asked their mothers to move in to the home.[3] This period was rife with tension and a lack of communication between the parents, which led to stress for the children, manifesting in negative shifts in their behavior.

But an April 28 court order on temporary matters named Matthew the children's physical caregiver, required Stephanie to move out of the marital home, and established a visitation schedule that remained in place at the time of the dissolution hearing. According to that temporary schedule, Stephanie exercised visitation from Tuesday afternoon to Wednesday afternoon and on alternating weekends. The order afforded each parent the right to a phone call each Saturday night during the other parent's visitation. Stephanie was ordered to pay $167.00 per month in temporary child support while Matthew was ordered to pay Stephanie $1000.00 per month in temporary spousal support.

---

[2] During the incident in question, Matthew and Stephanie were arguing in the school parking lot about who was taking the children home and Matthew prevented Stephanie from removing the younger child from his car. By Stephanie's own admission at the dissolution hearing, she never believed Matthew intended to harm her.

[3] Matthew testified he asked his mother to move in because he "was afraid that [Stephanie] was going to make more false accusations against [him]. [Stephanie] responded by having her mother come stay in the house during that time as well."

The parties were set to have their dissolution trial in November 2020, and in anticipation of it, they filed a stipulation of assets and liabilities.[4] This stipulation included the agreed value of Matthew's retirement account. But, in the days leading up to the trial, one of the children was exposed to COVID-19. Both parents had spent time with the child before learning of the exposure; still, Stephanie said she was uncomfortable being in the courtroom with Matthew because of his potential exposure. So, Stephanie moved to continue the trial, and Matthew resisted. The court recognized the concern and offered to hold the trial by video conference—Matthew agreed, but Stephanie did not. With no agreement over the video conference option, the trial was rescheduled at the next available date, which was nine months later. In the interim, Matthew successfully requested a modification of the temporary child support, and Stephanie was ordered to pay $520.85 each month.

Ahead of the hearing in August 2021, Matthew filed an updated statement of his assets and liabilities; one of his retirement accounts had increased by more than $120,000.00. Again, the parties signed a stipulation of assets and liabilities, but one of the account values used by Stephanie was not the new, updated value. Adding to the confusion, in the joint pretrial statement filed by the parties, Matthew proposed Stephanie be awarded $237,860.00 of the retirement account at issue and Stephanie suggested a payment of $159,625.00. Yet at trial, Stephanie's attorney asked that the court use the current value and requested a payout of

---

[4] This judicial district requires a joint pretrial statement before a trial date can be set, and part of that statement requests asset values and whether those values are contested or not.

$221,704.03.[5]  Matthew resisted the recalculation, arguing Stephanie should not reap the benefit of unreasonably delaying the hearing.  In the end, the district court used the November 2020 value of $376,862.00, deducted the premarital value, and awarded Stephanie one half of that net value or $159,594.53.

During the portion of the trial discussing the physical-care dispute, Matthew explained his concerns with an award of joint physical care.  First, he raised concerns over Stephanie's ongoing mental-health issues and some concerning notes she wrote in her journal in 2018.  Then, addressing her lack of focus, he pointed to instances in the past where Stephanie sent the older child to school at the regular time in spite of weather delays, was not there when the child got home from school, or accidentally tried to give the child two doses of her medication.  More recently, when the children have returned from their visits with Stephanie, they have reported to Matthew they have not taken their medication at all.  He also had concerns because the children sometimes came back after visits either hungry or sick from eating "junk food," unbathed, and dressed inappropriately for the weather.  Matthew reported difficulty getting Stephanie to answer emails or text messages about the children or answer the phone for his scheduled calls during her visits.  He offered testimony that the older child's behavior has improved under the current schedule, but there are still times where the older child can be

---

[5] The value of the disputed retirement account at trial was $501,021.00.  In Stephanie's calculation, she deducted the premarital value of $57,612.92 and then divided the remainder in half.

aggressive toward the younger child; Matthew believed this behavior went unchecked by Stephanie.[6]

On the custody subject, Stephanie emphasized her earlier role as the primary caretaker of the children. She reported the work done on her mental health during the CINA case had been helpful. Though she no longer participated in counseling or regularly takes medication, she believed she had found ways to maintain her mental health. Overall, she asserted she did not have the opportunity to demonstrate her growth because of the limited time she was given with the children. When asked, Stephanie stated she respected some aspects of Matthew but did not really respect him. As for her financial stability, Stephanie testified she was now working full-time as a seamstress making $21.75 per hour and earning time-and-a-half pay for overtime.

Stephanie also offered, as exhibits, two promissory notes she had from her parents. One reflected a $20,072.50 loan from her parents to pay for attorney fees—Stephanie asked the district court to order Matthew to pay her total attorney fees of $33,765.08, including the money her parents had fronted. Matthew requested $15,000.00 in attorney fees from Stephanie.

The district court awarded Matthew physical care; it granted Stephanie visitation every other weekend from Friday afternoon to Monday afternoon and every Tuesday afternoon to Wednesday afternoon. Stephanie was required to pay $713.91 each month in child support, and Matthew was required to pay $1000.00

---

[6] Matthew gave examples of the younger child's uncharacteristic behavior indicating the issue, including once when the younger child reported the older child had punched her in the stomach and later proceeded to throw up.

in spousal support each month until January 2026. The district court also divided Matthew's retirement accounts based on their value at the original trial date rather than the actual trial date. After comparing each party's requested attorney fees and ability to pay, the district court ordered Matthew to pay $10,000.00 of Stephanie's attorney fees.

Matthew and Stephanie each filed a motion to reconsider and amend; the district court denied both. Stephanie now appeals.

## II. Discussion.

Stephanie appeals the dissolution decree, arguing the district court should have awarded her and Matthew joint physical care, the retirement accounts should have been valued at the date of the dissolution trial, and she should have been awarded all of her attorney fees.[7] Our review is de novo, but we give weight to the findings of the district court, especially its credibility determinations. *See In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007).

A. Joint Physical Care.

Both parties agreed to joint legal custody; Stephanie focused in her appellate brief on a request for joint physical care. So we do as well. "'Physical care' means the right and responsibility to maintain a home for the minor child[ren] and provide for the routine care of the child[ren]." Iowa Code § 598.1(7) (2019). When one parent is granted physical care, the other parent is often given the right

---

[7] Stephanie also argues the district court erred in not granting her spousal support. This is factually inaccurate—Stephanie was awarded $1000.00 in monthly spousal support for sixty-two months, which was the amount she requested. Insofar as the argument is meant to head off any assertion by Matthew that she should not have been awarded spousal support, as Matthew has not cross-appealed the issue, we address it no further.

to visitation. *Hansen*, 733 N.W.2d at 691. But, when a court awards joint physical care, the parents both "have rights and responsibilities toward the child[ren] including but not limited to shared parenting time with the child[ren], maintaining homes for the child[ren], providing routine care for the child[ren] and under which neither parent has physical care rights superior to those of the other parent." Iowa Code § 598.1(4). Courts consider the unique facts of each case to determine if joint physical care is in the best interests of the children, ensuring they are placed "in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695. Importantly, "[p]hysical care issues are not to be resolved based upon perceived fairness to the spouses, but primarily upon what is best for the child[ren]." *Id.* The factors courts use to determine if joint physical care is in the children's best interests are:

> (1) "approximation"—what has been the historical care giving arrangement for the child between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (quoting *Hansen*, 733 N.W.2d at 697–99).

    i. Approximation.

Stephanie was undoubtedly the primary caregiver when the children were younger, but Matthew has predominantly taken on this role in recent history. The goal of approximation is to avoid disruption to the children's lives, not to give credit to the parents for their prior parenting time. *See Hansen*, 733 N.W.2d at 698–700 ("Conversely, where one spouse has been the primary caregiver, the likelihood

that joint physical care may be disruptive on the emotional development of the children increases. . . . The concepts of continuity, stability, and approximation thus cut strongly against joint physical care as a quality alternative least disruptive to the children and most likely to promote their long-term physical and emotional health."). Since 2016, Matthew has been the constant for these children, providing the lion's share of their care apart from stints of attempted co-parenting. Thus, Matthew has the edge on this factor. But approximation alone is not reason enough to make this decision, especially because both children have been in school or daycare since at least 2016. *See Berning*, 745 N.W.2d at 93 ("We also find approximation is mitigated in this case because [the child] has spent a considerable portion of his life in daycare or pre-school."); *see also In re Marriage of Vaughn*, No. 14-0135, 2014 WL 6682052, at * 3 (Iowa Ct. App. Nov. 26, 2014) (finding approximation concerns were allayed because the child would be in the same school regardless of the physical-care arrangement, ensuring consistency in a daily routine).

ii. Communication and Respect.

"Given the fact that neither parent has rights superior to the other with respect to the child's routine care, joint physical care also envisions shared decision making on all routine matters. Obviously, such decision making requires good communication between the parents as well as mutual respect." *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007). Even in recent years while Matthew has had physical care, he and Stephanie have struggled to communicate and are unable to agree even on a mode of communication. Stephanie herself testified she respected some aspects of Matthew, but did not really respect *him.*

She also stated, "I've shied away from . . . a lot of in-depth conversations because I just don't feel like they've been productive. . . . I just feel like, given the circumstances, it's been really hard to do that." She prefers not to speak with him in person at exchanges because when "it's happening in real time . . . you never know exactly what's going to come up and what emotions it might bring up." But Matthew testified that even when he attempted to send her a text message or email, Stephanie will not always respond; Stephanie explained she will not respond if she takes issue with what Matthew is asking. And while in a dissolution "excellent communication and cooperation [are] the exception and certain failures in cooperation and communication [are not] surprising," *In re Marriage of Ellis*, 705 N.W.2d 96, 103 (Iowa Ct. App. 2005), Matthew and Stephanie have not demonstrated they could successfully cooperate enough and share care of the children. So, this factor weighs against joint physical care.

iii. Conflict.

"The prospect for successful joint physical care is reduced when there is a bitter parental relationship and one party objects to the shared arrangement." *Hansen*, 733 N.W.2d at 698. Because of the potential detriment conflict can cause to the children, "[c]ourts must balance the marginal benefits obtained from the institution of a joint physical care regime as compared to other alternatives against the possibility that interparental conflict will be exacerbated by the arrangement." *Id.* at 699. In its dissolution decree, the district court gave great weight to Matthew and Stephanie's "strained and contentious" relationship. We agree the conflict between these parents does not promote a grant of joint physical care. In a time of attempted coparenting, Stephanie made the unilateral decision to take the

children out of their home and used time with them as a bargaining chip; when an injunction prevented her from doing so, she tried to file for a protective order against Matthew without merit. And when they tried to coparent afterwards, tensions in the home grew until the district court ordered her to move out and established the current care pattern. While Stephanie argues joint physical care would lessen the conflict between the parents by equalizing the power balance, we cannot agree given the parents' track record. Ultimately, as long as the focus remains on what power balance is fair to the parents rather than what is best for these children, the conflict will likely never dissipate and the children will suffer its effects.

iv. Daily Matters.

Both parents testified to the differences in their parenting styles, and Stephanie argues these types of differences do not necessarily weigh against an award of joint physical care. *See In re Marriage of Kreager*, No. 07-1587, 2008 WL 4569885, at *5 (Iowa Ct. App. Oc. 15, 2008) ("The district court found, and we agree, that although the parties have different parenting styles, neither style is necessarily right or wrong and they in fact complement each other."). Based on Matthew's testimony about how the parents differ in feeding the children, medicating the children, and controlling the older child's behavior toward the younger child, we are not convinced these differences are quite so benign. We believe Matthew shows more stability in the caretaking role since he began handling more of the daily responsibilities. And, the concerns raised by Matthew over Stephanie's ability to deal with daily matters directs us away from a joint-physical-care plan.

It is clear that both Matthew and Stephanie love their children and wish to spend time with them. But, focusing on what is in the children's best interests and considering the factors important to the success of a joint-physical-care plan, we affirm the district court's decision to award the parties joint legal custody with Matthew as the physical caretaker.

B. Division of Retirement Accounts.

Stephanie next argues the district court should have divided retirement assets as of the actual trial date rather than the initial trial date.[8]

When dividing marital assets, "[i]n most cases, it is equitable to value [them] as of the trial date." *In re Marriage of Milne*, No. 20-0228, 2020 WL 5230461, at *8 (Iowa Ct. App. Sept. 2, 2020). Nevertheless, there are "occasions when the trial date is not appropriate to determine values. Equitable distributions require flexibility and concrete rules of distribution may frustrate the court's goal of obtaining equitable results." *In re Marriage of Driscoll*, 563 N.W.2d 640, 642 (Iowa Ct. App. 1997). These determinations depend on the unique facts of each case. *Id.*

Matthew argued, and the district court agreed, that Stephanie should not glean the benefit of the increase in his retirement account after she delayed their trial date. We find this argument unconvincing. The district court was presented with evidence of Stephanie's "questionable motives" for the continuance at the time she made the request. Still, in granting the continuance against Matthew's

---

[8] The district court divided all marital assets based on their value as of the first trial date. But Stephanie only asks us to remedy the division of the retirement accounts, so we address only those.

objections, the court had to be "satisfie[d] that substantial justice [would] be more nearly obtained" by doing so. *See* Iowa R. Civ. P. 1.911(1). While equity requires some flexibility, we will not use that flexibility to penalize Stephanie for the district court's decision to grant the continuance—a choice that, on appeal, we presume is correct. *See, e.g.*, *Countryman v. McMains*, 381 N.W.2d 638, 639 (Iowa 1986). We also recognize and do not criticize how people chose to respond to any exposure to COVID and do not think a sanction because of that avoidance should be assessed here.

As we have noted in other cases, the default is to value assets as of the trial date, and this case gives us no reason to deviate from that. *See In re Marriage of Campbell*, 623 N.W.2d 585, 588 (Iowa Ct. App. 2001) ("We continue to use the date of trial as the most appropriate date to value assets, while recognizing the need for flexibility in making equitable distributions based on the unique circumstances of each case. Under the facts of this case, it is neither practical nor equitable to use the date of separation to value just one asset."). The pretrial filings presented various values for the district court to consider, so we think it best to stick to one date to value all assets.[9] *See In re Marriage of Bangs,* No. 09-0169, 2009 WL 2951513 at *4 (Iowa Ct. App. Sept. 2, 2009) ("[U]sing the date of trial to fix the values of assets . . . avoid[s] asset valuation from becoming a moving

---

[9] As Matthew noted in one of his pretrial filings, some "values have not been updated since the original trial date, which was November 2020. Some assets' values have increased and some have decreased with the market's ebb and flow and as expenses (including attorney fees) have been paid. [Matthew's] credit card debt has increased since November 2020." We believe all assets should be valued as of the same date and not just selected assets that are only affected by the market.

target."). In the end, Matthew cannot argue that any efforts made by him, between the initial trial date and the date the trial was held, resulted in the increased values so that it would be inequitable for Stephanie to realize the same gain in the funds he did under the decree.

The parties agreed that $57,612.93 of Matthew's 401(k) and $18,233.81 of his Roth IRA were premarital assets and should be deducted before distribution. Matthew's affidavit of financial status filed with the court just days before the trial began, shows the values of the retirement accounts at $501,021.00 in his 401(k) and $149,961.00 in his IRA. After subtracting the premarital amounts (pursuant to the parties' agreement),[10] $443,408.07 of the 401(k) and $131,727.19 of the IRA should be divided. To award an equal share of the marital balances, Stephanie is entitled to $221,704.03 from the 401(k) and $65,863.60 from the Roth IRA. We modify the property division accordingly.

C. Attorney Fees.

Stephanie's final argument is that the district court should have granted her the complete amount of her attorney fees. We review the grant of attorney fees for an abuse of discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). "'Whether attorney fees should be awarded depends on the respective

---

[10] "Under our statutory distribution scheme, the first task in dividing property is to determine the property subject to division. The second task is to divide this property in an equitable manner according to the enumerated factors in section 598.21 of the Iowa Code." *In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007) (internal citation omitted). "[T]he property included in the divisible estate includes not only property acquired during the marriage by one or both of the parties, but property owned prior to the marriage by a party." *Id.* (citation omitted). "The district court 'may not separate [a premarital] asset from the divisible estate and automatically award it to the spouse that owned the property prior to the marriage.'" *Id.* (alteration in original) (citation omitted).

abilities of the parties to pay.' To determine the ability to pay, we review the parties' entire financial picture, 'including their respective earnings, living expenses, and liabilities.'" *In re Marriage of Kimbro*, 826 N.W.2d 696, 704 (Iowa 2013) (citations omitted). We will not disturb the district court's award unless it "rests on grounds that are clearly unreasonable or untenable." *Id.* at 698. "A ruling is clearly unreasonable or untenable when it is 'not supported by substantial evidence or when it is based on an erroneous application of the law.'" *Id.* at 698–99 (citation omitted). The district court was within its right to require Matthew to pay Stephanie an amount of attorney fees because she makes a fraction of Matthew's income; and we find no abuse of the court's discretion in setting the amount at $10,000.00. We will not disturb that award.

Stephanie and Matthew request appellate attorney fees. We have broad discretion to grant appellate attorney fees to the prevailing party and consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993) (citation omitted). Because Stephanie was unsuccessful in the majority of her claims, we decline to award her appellate attorney fees. And while Matthew was largely successful, he also earns much more than Stephanie; because Stephanie does not have the ability to pay Matthew's appellate attorney fees, we decline Matthew's request.

## III. Conclusion.

Because joint physical care is not in the children's best interests and we find no abuse of the trial court's discretion in its award of attorney fees, we affirm those portions of the decree. But, finding no facts to support using a date other than that

of the dissolution trial to determine the value of marital assets, we remand to the district court with instructions to file the appropriate QDRO necessary to divide the accounts appropriately.

**AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**