## IN THE COURT OF APPEALS OF IOWA

No. 24-0140
Filed October 16, 2024

**NICHOLAS R. ROSENOW,**
        Plaintiff-Appellee,

**vs.**

**TARA D. LINK,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Dubuque County,
Michael J. Shubatt, Judge.


        Tara Link appeals the decree granting her and Nicholas Rosenow joint
physical care of their child. **AFFIRMED AND REMANDED.**


        Stuart G. Hoover of Alliance Law Office, East Dubuque, Illinois, for
appellant.

        Christopher M. Soppe of Pioneer Law Office, Dubuque, for appellee.


        Considered by Greer, P.J., Langholz, J., and Doyle, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206
(2024).

**DOYLE, Senior Judge.**

Tara Link appeals the custody decree granting her and Nicholas Rosenow joint physical care of their one-year-old child, B.L. Tara contends that joint physical care is not in the child's best interests and asks us to place B.L. in her physical care. She also challenges the portion of the decree granting Nicholas's request to add his surname to the child's name.[1]

### I. Background Facts and Proceedings.

Nicholas petitioned for custody and visitation of B.L. in January 2023, the day after B.L. was born. That May, the district court entered a temporary order granting the parents joint physical care of the child on a "2-2-3 schedule," which allowed each to care for B.L. on two weekdays and alternating weekends. At the October trial, Nicholas asked for joint physical care while Tara asked the court to place B.L. in her physical care.

The district court entered a decree in January 2024. It observed that Tara and Nicholas "are remarkably similar in many respects": both are teachers who have summers free, they both live with their parents and "have excellent family support," and neither has a criminal record or substance-use issues. The court found no significant disagreement regarding child rearing practices. It also noted

---

[1] In her brief, Tara makes passing mention of the court's failure to address two issues in the decree: (1) a right of first refusal if the parent exercising care for B.L. cannot do so and (2) a retroactive award of child support for the period before the temporary order, when B.L. was in her care. She does not address these claims further. Even if Tara sufficiently argued these issues on appeal, she failed to preserve error because she never alerted the trial court of its failure to address them. *See Konchar v. Pins*, 989 N.W.2d 150, 160 (Iowa 2023) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we decide them on appeal." (citation omitted)).

that the parents have cared for B.L. equally for most of his life with "no credible evidence that [the child] has suffered in any way for this arrangement, which has allowed for a bond to develop between B.L. and both of his parents."

The district court also expressed concern about Nicholas and Tara's relationship. It found that "[t]he degree of communication and respect between the parties is not optimal," which "is largely due to a lack of trust." The court also noted "some conflict between the parties," but found "this is not unusual during a custody case." It believed that Nicholas and Tara can communicate about the child's care and anticipated their continued ability to do so. It also found that "the level of hostility shown [in video recordings admitted into evidence] is nowhere near that which was portrayed in the testimony given in the trial" and dismissed Tara's claim that Nicholas assaulted her as "unsubstantiated and unproven." While the court observed that Nicholas "became agitated during cross-examination and was defensive in response to certain questions from Tara's counsel," it believed the video evidence showed he can "walk away from a disagreement rather than engage in inappropriate or violent behavior."

Ultimately, the court concluded that Nicholas and Tara "are both good enough people and, more importantly, good enough parents, to each have a chance to spend as much time with B.L. as circumstances allow" and granted joint physical care of the child. Given the equal roles that Nicholas and Tara will continue to play in B.L.'s life, the court also found that "[i]t only makes sense that the child should bear both their names" and granted Nicholas's request that the child's last name be hyphenated to include both parents' surnames.

**II. Scope and Standard of Review.**

Because custody matters are tried in equity, our review is de novo. *See* Iowa R. App. 6.907; *Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017). We give weight to the district court's fact findings although they are not binding. *See* Iowa R. App. P. 6.904(3)(g). We also recognize that the district court had the benefit of listening to and observing the parties in person while we must rely on the printed record in evaluating the record. *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984). For this reason, we defer to the district court's credibility findings. *Id.*

**III. Physical Care.**

Tara challenges the physical care provision of the custody decree. She contends that joint physical care is not in B.L.'s best interests and argues his best interests are served by placing him in her physical care.

In deciding matters of child custody and visitation, the court considers the applicable factors set out in Iowa Code section 598.41 (2023). *See* Iowa Code § 600B.40(2). The court must consider granting the parents joint physical care if either parent requests it. *See id.* § 598.41(2)(a). In deciding whether to grant the parents joint physical care, our primary concern is the child's best interests. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007). Our supreme court has identified "a nonexclusive list of factors" to consider in determining whether a joint-physical-care arrangement will serve the child's best interests:

> (1) "approximation"—what has been the historical care giving arrangement for the child between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which

the parents are in general agreement about their approach to daily matters."

*In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (quoting *In re Marriage of Hansen*, 733 N.W.2d 683, 697-99 (Iowa 2007)). Tara argues that each of these factors weighs against granting joint physical care.

On the question of approximation, the record shows that Nicholas and Tara have acted as B.L.'s caretaker equally since the child was four months old—roughly 80% of the child's life. Tara tries to minimize Nicholas's caretaking role, claiming that she alone provides caretaking when B.L. is in her care while Nicholas's mother shares in his caretaking responsibilities.[2] But there is no evidence that Nicholas has abdicated his parenting role by passing all caregiving duties to his mother, and we do not fault Nicholas for raising B.L. with help from extended family.

Tara also claims that B.L. would benefit from having a single home and set routine, citing her testimony that B.L. slept through the night at six weeks of age but stopped when the joint-physical-care arrangement went into effect. She also claims that she stopped breastfeeding B.L. after the joint-physical-care arrangement took effect because it became "impractical." On this basis, she blames joint physical care for B.L. not receiving nutrients or mother-son bonding that breastfeeding would have otherwise afforded. But there is no evidence that B.L. is nutrient deficient, and joint physical care has allowed B.L. to bond with Nicholas. Even accepting Tara's claims as true, the same issues would have

---

[2] Tara and Nicholas have each moved into their parents' homes.

arisen when Nicholas had overnight visits with B.L. on alternating weekends, the standard visitation provided to a noncustodial parent.

Turning to the ability of the parties to communicate and show respect, the district court found while it was "not optimal," it was common:

> Both parties want to prevail in this action and to that extent question each other's motives when certain questions are asked and seize on anything they believe may help their own case or hurt the other party's case. In the Court's experience, this is not unusual during a custody action. There have been misunderstandings and outright disagreements, but these occur in every parenting relationship. The Court concludes that the level of communication has room for improvement, but that the parties are and will continue to be able to communicate with each other regarding the important aspects of B.L.'s care.

This court has made similar observations in other custody appeals. *See, e.g.*, *In re Marriage of Ellis*, 705 N.W.2d 96, 103 (Iowa Ct. App. 2005) (finding "excellent communication and cooperation to be the exception and certain failures in cooperation and communication not to be surprising" in custody cases involving parents whose relationship has ended recently), *disagreed with on other grounds by Hansen*, 733 N.W.2d at 692; *Dietz v. McDonald*, No. 08-0129, 2008 WL 5234524, at *7 (Iowa Ct. App. Dec. 17, 2008) ("[S]ome failures of communication and cooperation are not surprising with the breakup of a romantic relationship and must be viewed in that context."). "Although cooperation and communication are essential in a shared-care arrangement, tension between the parents is not alone sufficient to demonstrate a shared-care arrangement will not work. Instead, the communication difficulties and tension must rise above the not atypical acrimony that accompanies litigation in family-law matters." *Hensch*, 902 N.W.2d at 826 (internal citation omitted). We agree that the evidence does not show that these

issues impair Tara and Nicholas's ability to co-parent effectively. *See In re Marriage of Barendt*, No. 12-1822, 2013 WL 3458169, at *3 (Iowa Ct. App. July 10, 2013) (finding joint physical care was in the children's best interests, despite communication problems, where the record showed the parents shared caretaking duties successfully during dissolution proceedings).

We likewise find the degree of conflict between the parties is not as great as they portrayed in their testimony to the court. The district court found that

> [w]hile some of the videos show the parties disagreeing or displaying some snippiness, the level of hostility shown is nowhere near that which was portrayed in the testimony given in the trial, nor was it at a level that causes the Court to believe that physical violence is likely between these parties if they were to continue exercising shared care.

The court found that Tara's claims about Nicholas calling her names and assaulting her during B.L.'s medical appointment are "unsubstantiated and unproven." The court made credibility determinations in assessing the evidence to which we defer. *See In re Marriage of Harris*, No. 12-1969, 2013 WL 5394283, at *4 (Iowa Sept. 20, 2013) ("We are guided by the district court's finding that Angela's allegations regarding parental conflict and conduct lacked credibility."). After viewing the evidence, we agree that the concerns stated by the parties are overblown. More importantly, the evidence does not show that any conflict between Nicholas and Tara has affected B.L.

Finally, the record does not support Tara's claim that she and Nicholas disagree significantly about childrearing—aside from Tara's belief that the child would benefit exponentially by placement in her physical care. As the district court found, their disagreements have been "episodic in nature, as opposed to global."

We agree that the record shows that joint physical care serves B.L.'s best interests and affirm the physical care provisions of the parties' decree.

**IV. Name Change.**

Tara also challenges the portion of the decree changing the child's name to include both parents' surnames, hyphenated. She argues that the child's last name should not be changed because Nicholas agreed to the name and it is important to preserve her family name. She also argues that the child will know that his parents disagreed about his name.

Neither Tara nor Nicholas has a superior right to decide the child's last name. *See Montgomery v. Wells*, 708 N.W.2d 704, 707-08 (Iowa Ct. App. 2005). And the court has authority to determine the child's surname in an action under Iowa Code section 600B.40. *Id.* at 707. This court identified twelve factors to weigh in resolving a dispute over a child's name:

(1) Convenience for the child to have the same name as or a different name from the custodial parent.
(2) Identification of the child as part of a family unit.
(3) Assurances by the mother that she would not change her name if she married or remarried if the child maintains the mother's surname.
(4) Avoiding embarrassment, inconvenience, or confusion for the custodial parent or the child.
(5) The length of time the surname has been used.
(6) Parental misconduct, such as support or nonsupport or maintaining or failing to maintain contact with the child.
(7) The degree of community respect associated with the present or changed name.
(8) A positive or adverse effect a name change may have on the bond between the child and either parent or the parents' families.
(9) Any delay in requesting or objecting to name change.
(10) The preference of the child if the child is of sufficient maturity to express a meaningful preference.
(11) Motivation of the parent seeking the change as an attempt to alienate the child from the other parent.
(12) And any other factor relevant to the child's best interest.

*Id.* at 708–09 (internal citations omitted). Ultimately, the court must resolve the dispute based on the child's best interests. *Id.* at 708.

In deciding the child's last name, the court considered both parents' requests and found that hyphenating their surnames serves the child's best interests. It noted that hyphenated names "are ubiquitous" in 2024 and the Iowa Supreme Court has "recognized that a hyphenated name of both parents' surnames may best serve the interest of a child." *In re Marriage of Gulsvig*, 498 N.W.2d 725, 729 (Iowa 1993). Because "Nick and Tara will continue to play equal roles in B.L.'s life," the court concluded that it "makes sense that the child should bear both their names." It also found the child is too young to be attached to a surname or have peers who identify him by his current surname, so changing it would cause no emotional harm. The court acknowledged that the parties would need to obtain a new birth certificate and social security card for the child, but it found such inconveniences are "relatively minor." Balancing the benefits against the concerns, the court found that bearing both parents' surnames will serve the child's best interests.

On the facts before us, we agree that hyphenating both parents' surnames is in the child's best interests. Tara's concerns about the child learning of this legal dispute based on the name change is unavailing as the new birth certificate will not indicate any change.[3] *See* Iowa Code § 144.38 (requiring an amended copy of a birth record to be marked as "amended" *except* in paternity cases); 144.40

---

[3] Whereas this opinion, in the appeal Tara initiated, will provide a detailed record of the dispute and be readily available online.

(providing that "the state registrar shall establish a new certificate of birth to show paternity" and "the surname of the child may be changed," but "*[t]he certificate shall not be marked 'amended'*" (emphasis added)). As to Tara's claim that he agreed to use her surname as the child's last name, Nicholas testified that he proposed hyphenating their surnames and Tara refused that option. Tara's testimony supports his claim.[4] Turning then to the importance of preserving Tara's family name, the hyphenation of both surnames does so while also acknowledging Nicholas's family. On the facts before us, we agree that it is in the child's best interests to hyphenate both parents' surnames. We affirm the second paragraph of the district court's decree changing the child's last name from B.L. to B.L.-R.

**V. Appellate Attorney Fees.**

Finally, Nicholas requests that we award attorney fees. He argues that he spent a large sum of money in litigating the child's custody before the district court

---

[4] During her testimony, Tara admits that she and Nicholas discussed the child's name. But she was equivocal about the consideration she gave to including Nicholas's surname in the child's name:

> Q. You were never going to agree to Rosenow; right? A. I wouldn't say "never."
> Q. Okay. But didn't you tell him that it was set in stone—[B.L.]? A. Once we came to that agreement, I said, "Yes, it's set in stone."
> Q. But prior to that, you were never going to let him do Rosenow? A. I believe we discussed it.
> Q. And your discussion was you don't want Rosenow; right? A. I told him the reasons why I thought it was important for him to have Link.
> Q. I understand that. But you weren't going to agree to Rosenow? A. I wouldn't say I wasn't going to. I don't think in my mind I said, "No, we are not going to go with Rosenow."
> Q. But you didn't agree to Rosenow? A. At the end of the time, I did not agree to Rosenow.

On this point, we find Nicholas more credible.

and continued to accrue attorney fees defending the district court's order on appeal.

Iowa Code section 600B.26 allows us to award the prevailing party reasonable attorney fees. In considering whether to award appellate attorney fees, "[o]ur 'controlling consideration' is the parties' relative financial positions, but we also consider the merits of the appeal and 'whether a party has been obliged to defend the trial court's decision on appeal.'" *See In re Marriage of Kisting*, 6 N.W.3d 326, 338 (Iowa Ct. App. 2024) (citation omitted). The district court found that Tara earns about $500 more per month than Nicholas. Because Nicholas had to defend the decree on appeal and was successful on appeal, the record supports an award of his appellate attorney fees. But without an affidavit of attorney fees in support of his request, we remand to the district court to determine the amount of Nicholas's appellate attorney fees and enter judgment against Tara in a reasonable amount. *See id.*

**AFFIRMED AND REMANDED.**